[S. F. No. 5788.   In Bank.—February 5, 1912.]

In the Matter of the Estate of THERESE BERTHOL MOR-
CEL, otherwise known as Therese Berthol, Deceased.

WILL—UNDUE INFLUENCE—CONTEST—BURDEN OF PROOF.—In a contest
   of a will on the ground of undue influence the burden of proof
   is on the contestant to show facts from which an inference of undue
   influence could reasonably be drawn.

ID.—WHAT CONSTITUTES UNDUE INFLUENCE.— The kind of influence
   that may be held to be undue influence warranting a repudiation
   of a will must be such as in effect destroyed the testator's free
   agency and substituted for his own another person's will.   Mere
   general influence not brought to bear on the testamentary act is
   not undue influence, but the influence must be used directly to pro-
   cure the will, and must amount to coercion destroying free agency
   on the part of the testator.

ID.—MISREPRESENTATIONS MADE TO TESTATOR—DISINHERITANCE DUE TO
   QUARREL.—If the will as made expresses the then well settled de-
   termination of the testator himself concerning the disposition of
   his property, and there is nothing affirmatively shown to warrant
   the conclusion that the making of the will was suggested by any
   other party, it cannot be held to have been obtained by undue
   influence, even though the determination of the testator to exclude
   a relative from participation in his property has been in part or
   even wholly caused by mere misrepresentation of fact by others as
   to such relative, or is the result of a quarrel or dispute with such
   relative, inspired and encouraged by another for the very purpose
   of bringing about a breach and a consequent disinheritance to his
   benefit.

ID.—MERE FRAUD NOT UNDUE INFLUENCE.—Mere fraud does not consti-
   tute undue influence, but is an entirely separate and distinct ground
   for invalidating a will, and while undue influence may be exerted
   by means of fraud, there can be no such influence without an im-
   pairment of the free agency of the testator.

ID.—SUSPICION OF UNDUE INFLUENCE INSUFFICIENT TO SET ASIDE WILL.
   —A mere suspicion that undue influence may have been used is not
   sufficient to warrant the setting aside of a will on that ground.
   The evidence must amount to proof, and such evidence has the force
   of proof only when circumstances are proven which are inconsistent
   with the claim that the will was the spontaneous act of the testator.

ID.—DISINHERITANCE OF NATURAL DAUGHTER—WILL IN FAVOR OF MAN
   WITH WHOM TESTATRIX LIVED AS WIFE—UNDUE INFLUENCE NOT
   SHOWN.—In a contest of a will by a disinherited natural daughter
   of the testatrix, on the ground of the alleged undue influence of a
   man who was the main beneficiary, and with whom, although un-

married to him, the testatrix had affectionately lived as a wife for upwards of thirty years, it is held that there is nothing in the provisions of such will to raise even a suspicion of improper influence, or to impose upon such beneficiary the burden of showing that he had not used undue influence to procure its execution, in view of the admitted circumstances that the daughter and the testatrix had been practical strangers for the first forty-seven years of the former's life, and had been on unfriendly terms for a period long antedating the making of the will and extending to the time of the death of the testatrix.

ID.—CONFIDENTIAL RELATION BETWEEN PERSONS LIVING AS HUSBAND AND WIFE—NO INFERENCE OF UNDUE INFLUENCE.—The relation existing between such beneficiary and the testatrix was confidential in the same sense and to the same extent that the relation of husband and wife living together in harmony is always confidential, but was of itself, and in the absence of other evidence tending to show undue influence, insufficient to raise an inference of such influence, or to impose upon the beneficiary the burden of showing its absence, or in the absence of such showing by him to warrant setting the will aside.

ID.—ACCOMPANYING TESTATRIX TO OFFICE OF ATTORNEY—BEING PRESENT AT EXECUTION OF WILL.—The mere fact that such beneficiary went with the testatrix to the office of a lawyer, where she executed the will, and was present while she gave her directions as to its provisions, and while she executed it, is a circumstance to be taken into consideration in determining whether there was undue influence, but in the absence of other evidence tending to show it, is insufficient to raise any inference of such influence.

ID.—REVIEW OF EVIDENCE—INSUFFICIENT SHOWING OF UNDUE INFLUENCE.—In such contest it is held, upon a review of the evidence, that there is nothing therein that is capable of doing more at the most than warranting a mere suspicion or surmise that undue influence *may* have been exerted in the matter of the execution of the will, and that it was insufficient to justify setting the will aside.

APPEAL from a judgment of the Superior Court of Alameda County refusing to admit an alleged will to probate and from an order refusing a new trial. F. B. Ogden, Judge.

The facts are stated in the opinion of the court.

E. K. Taylor, for Appellant.

R. B. Tappan, for Respondent.

ANGELLOTTI, J.—This is an appeal from a judgment refusing to admit to probate a paper offered as the last will of

deceased, and from an order denying the proponent's motion for a new trial.

The paper was one executed by "Therese Berthol" on January 30, 1908, with all the formalities required by law for the execution of wills. By its provisions the contestant, a natural daughter of deceased, was given ten dollars only, one Marie Doyen Morcel, wife of J. Vincent Morcel, was given the jewelry and personal effects of deceased, and all the rest of her property, amounting in value to some eighteen thousand dollars or twenty thousand dollars, was given to Joseph Morcel. Said Joseph Morcel and Gustave Kleinclaus were appointed executors without bonds.

The ground of contest was undue influence on the part of said Morcel, who was alleged by the contestant to have lived with her mother for many years in the relationship of man and wife, although never legally married. The contest was tried with a jury, to which were submitted the issue of undue influence and the issue of marriage or no marriage between deceased and Morcel. The jury found in favor of contestant upon both issues, viz: that the will was procured to be made through undue influence of Joseph Morcel, and that deceased was never married to said Morcel. Both of these conclusions are assailed as unsupported by the evidence.

At the outset it may properly be stated that the validity of the alleged will is, of course, in no way dependent on the question of marriage between deceased and Morcel. If the will was not procured by undue influence, the fact, if it be a fact, that Morcel was not legally the husband of deceased, could in no way affect it or impair its provisions. The question whether the relationship between Morcel and deceased was illicit can be material only as a circumstance in determining whether the will was procured by undue influence, and as will be disclosed by our statement of undisputed facts shown by the record in this case, it is apparent that here the question whether such parties were lawfully married is of no importance whatever in the determination of the question of undue influence.

The substantial contention on this appeal is that the finding of undue influence is without sufficient support in the evidence.

As said before, contestant was the natural daughter of de-

ceased. She was born in France in the year 1860, and, so far as appears, was never in the care and custody of deceased, and never has been supported in whole or in part by the deceased. In 1872 deceased, who had never married, met Morcel in France. Morcel had a few months before married a woman who had then left him, and whom he has never since seen. During that year, deceased and Morcel came together from France to California. According to his testimony, this woman brought a divorce action against him in October, 1872, and obtained such divorce in October, 1873. He said that he received the papers showing that such divorce had been granted in the year 1877. This was the only evidence on the question of divorce. Some four years after their arrival in California, deceased and Morcel agreed to live together as husband and wife, with the understanding that their several earnings should be kept separate. From that time to the day of death of deceased, a period of over thirty years, the parties lived together as husband and wife. There is nothing to indicate that the relationship thus formed was not entirely satisfactory to both parties to the end, and there was absolutely nothing to distinguish it, in the eyes of the world, from the relationship of husband and wife, save the single fact that deceased used her maiden name in some matters of business, such as her bank deposit, and her will, and was referred to in the same way in some letters written to the contestant. To the public generally she was known as Madame Morcel, the wife of Morcel, and the parties held themselves out to the world as husband and wife. Apparently happy in their relations with one another, they were also industrious and frugal, and each accumulated money, Morcel becoming very well to do, and deceased accumulating, as already said, something in the neighborhood of twenty thousand dollars. The deceased was illiterate, being unable to read or write, except to the extent of signing her name, and Morcel generally attended to her investments and business affairs, as well as to writing her letters. Everything indicates that he was scrupulously honest with relation to her business, and without any desire to mingle anything fairly belonging to her with his own property. He knew nothing of the existence of contestant until the year 1887. From 1872 to 1887 there was no correspondence whatever between deceased and her daughter. After Morcel learned

from deceased of the existence of the daughter, a correspondence was commenced. Some of the letters on the part of deceased were signed "Therese Berthol" and others were signed in his own name by Morcel. All the letters so written which are contained in the record were written by Morcel, and these letters show, as does the other evidence on the subject, a friendly feeling upon the part of both Morcel and deceased for the contestant and her husband, a desire on their part that the contestant and her husband should come to California and live near her mother, and a disposition to assist them financially in getting a home if they did come. During a few years next preceding their coming to California, it appears to have been the desire of deceased to make contestant a beneficiary under her will. The record shows that there was no dissent to this on the part of Morcel, and in his expressions to both contestant and her husband he took it for granted that .contestant was to share in the property left by deceased at her death. Finally, in January, 1907, in response to repeated invitations on the part of deceased and Morcel, contestant and her husband came to California. They were received by deceased and Morcel in the most affectionate manner. For a short time they lived with the old people, but soon established themselves in another place. Morcel introduced the husband at the French Bank in San Francisco, where he obtained a position. Deceased assisted contestant in the purchase of a home by contributing two thousand dollars of the purchase money. As long as the relations between the deceased and her daughter continued to be friendly, Morcel was apparently most friendly, and the record shows that he assisted in keeping the parties on friendly terms on one or two occasions when strained relations had followed quarrels between them. But it speedily became evident that the contestant and deceased could not get along together. There were several quarrels between deceased and contestant, and finally, in the latter part of December, 1907, a dispute arose between the two at contestant's house, Morcel not being present, ending, according to the claim of deceased, in the ejection of deceased from the house by her daughter. Deceased and contestant never met after that occasion, and there was apparently no real attempt at reconciliation on the part of either. The evidence of one of contestant's witnesses showed

that contestant avoided meeting her mother at the home of
the witness on one occasion, leaving the house at once when
she saw that her mother was a visitor there. The record shows
that the deceased felt that she had been treated very badly by
her daughter, and that she was satisfied that her daughter had
no affection whatever for her and cared only for her money.
The testimony as to a feeling of bitterness toward the daugh-
ter, continuing practically to the end of her life, and her de-
termination not to leave her any property, repeatedly ex-
pressed to various parties, is substantially shown without
conflict. On January 30, 1908, she went with Morcel to the
office of Mr. A. Comte, Jr., in San Francisco, an attorney
of the highest standing and repute, for the purpose of making
a new will. Morcel testified that deceased insisted on mak-
ing this will and that he accompanied her at her request. Mr.
Comte testified that he had made a previous will for her, be-
fore the fire of April, 1906, which was destroyed in his office
by the fire. Mr. Comte testified that he took his directions
as to the provisions of the will from her, and drew it ac-
cording to those directions, and that he saw nothing to indi-
cate that the will was not freely and voluntarily made by her.
The only evidence as to what was done with the will, when
executed, was the evidence of Morcel that deceased kept it a
few days and then requested him to keep it for her, and that he
kept it with his papers until about eight months before her
death, when he gave it back to her. He said that four days
after her death he found it among her others papers in a
drawer used by her for the purpose of keeping her private
documents. The fact of the making of this will was never
concealed and contestant herself knew within a few days of
January 30, 1908, that her mother had made it and that she
was given substantially nothing thereby.

Deceased was about seventy years of age at the time of the
execution of the will. While physically she was a small wom-
an, there is absolutely nothing to indicate that she was ever
weak mentally, or that Morcel was of "stronger . . . mind
and will power" than she. The evidence relied upon to show
that she was subject to his control in matters affecting her
property or actions was so trivial and inconsequential as not
to require notice here. Undoubtedly she relied upon his judg-
ment and honesty in the matter of the investment of her

CLXII Cal.—7

small earnings, and that this reliance was justified is shown by the fact that there had been accumulated as her property nearly twenty thousand dollars at the time of her death. Nor does it appear that her health was so impaired as to render her more susceptible to the influence of another.

Coming to a consideration of the circumstances relied upon as sufficient to sustain a conclusion that the will was the result of any undue influence on the part of Morcel, we find nothing that to our minds reasonably warrants an inference of such undue influence. The burden of proof was on contestant to show facts from which such an inference could reasonably be drawn. The kind of influence that may be held to be undue influence warranting a repudiation of a will "must be such as in effect destroyed the testator's free agency, and substituted for his own another person's will." (*Estate of Motz*, 136 Cal. 563, [69 Pac. 294].) It must be such "as destroys free agency, constraining the testator at the time the will is made to make a disposition of his estate contrary to and different from what he would have done if he had been left to the free exercise of his own inclination or judgment." (*Estate of Ricks*, 160 Cal. 450, [117 Pac. 536].) Mere general influence not brought to bear on the testamentary act is not undue influence, but "the influence must be used directly to procure the will," and must amount "to coercion destroying free agency on the part of the testator." (*Estate of Keegan*, 139 Cal. 127, [72 Pac. 828].) To warrant setting a will aside on this ground, the evidence must be "of such a nature as to warrant the inference that the will was the direct result of the influence exerted for the purpose of procuring it, and was not the natural result of the uncontrolled will of the testatrix." (*Estate of Snowball*, 157 Cal. 307, [107 Pac. 598].) If the will as made expresses the then well settled determination of the testator *himself* concerning the disposition of his property, and there is nothing affirmatively shown to warrant the conclusion that the making of the will was suggested by any other party, we cannot see how it can be held to have been obtained by undue influence, even though the determination of the testator to exclude a relative from participation in his property has been in part or even wholly caused by mere misrepresentation of fact by others as to such relative, or is the result of a quarrel or dispute with

such relative, inspired and encouraged by another for the very purpose of bringing about a breach and a consequent disinheritance to his benefit. Mere fraud does not constitute undue influence, but is an entirely separate and distinct ground for invalidating a will (Code Civ. Proc., sec. 1312), and while undue influence may be exerted by means of fraud, there can be no undue influence without an impairment of the free agency of the testator. (*Estate of Ricks,* 160 Cal. 467, [117 Pac. 539].) And it must also be borne in mind that a mere suspicion that undue influence *may* have been used is not sufficient to warrant the setting aside of a will on that ground. (*Estate of Keegan,* 139 Cal. 127, [72 Pac. 828].) The evidence against the will must "do more than raise a suspicion. It must amount to proof and such evidence has the force of proof only when circumstances are proven which are inconsistent with the claim that the will was the spontaneous act of the alleged testator." (*In re McDevitt,* 95 Cal. 33, [30 Pac. 106].) "In order to set aside a will for undue influence, there must be substantial proof of a pressure which overpowered the volition of the testator at the time the will was made." (*In re Langford,* 108 Cal. 623, [41 Pac. 705].)

In this case, even if we concede that the evidence was of such a nature as to support a conclusion that by reason of a prior marriage Morcel and deceased were never legally married, it is nevertheless clear that, so far as may be pertinent to any question of undue influence, there was nothing to distinguish their relationship from that of a husband and wife who for thirty years had lived affectionately together as such. For full that time they had lived together as man and wife, holding themselves out to the world in that light. There is not the slightest evidence to indicate that either did not entertain for the other the respect, affection, and confidence incident to a long and happy married life. Under these circumstances there was nothing unnatural or unreasonable about the will, nothing about its provisions, in view of the admitted facts as to the mother's feelings toward her daughter, to give rise to a suspicion that it was not her spontaneous act. Other than Morcel there was no living being except the daughter to whom she would naturally be expected to give any part of her property, and the evidence without any conflict whatever shows that the relations of the mother and daughter for

sometime preceding the execution of the will and up to the time of the death of deceased, fifteen months thereafter, were of such a nature as to render the exclusion of the daughter from participation in her estate entirely natural and reasonable. It is to be borne in mind in this connection that, in addition to the absolute and long continued breach, the daughter was practically a stranger to her mother until she came to California in 1907. What more natural under the circumstances than that the deceased should desire to give her property to Morcel? We repeat that under the circumstances admitted by contestant, there is nothing in the provisions of the will to give rise to even a suspicion of improper influence, or to impose upon Morcel the burden of showing that he had not used undue influence to procure its execution.

Undoubtedly, the relation between Morcel and deceased was confidential, in the same sense and to the same extent that the relation of husband and wife living together in harmony is always confidential, and there was in this case the added feature of the trust and confidence reposed by deceased in Morcel in the matter of her business affairs, but we do not understand that it has ever been held that any inference of undue influence in the matter of the execution of a will by one of the spouses in favor of the other can be drawn from the mere existence of a confidential relation, or, in other words, that by reason of such relation alone, the beneficiary is called upon to assume the burden of showing the absence of any undue influence, and in the absence of such showing by him the will may be set aside. Such relationship is, of course, a matter to be considered in connection with other evidence tending to show undue influence, and sometimes, in view of the nature of the provisions of the will and other circumstances, a most important matter, but in the face of an entirely natural and reasonable will and in the absence of other evidence tending to show undue influence, is not sufficient to warrant the setting aside the will. This general question was fully discussed in the recent case of *Estate of Ricks,* 160 Cal. 450, [117 Pac. 737], and it was there declared as follows: "There is no legal suspicion of undue influence arising from the existence of such a relationship, which imposes upon the son the necessity, when a will in his favor is attacked, of assuming the burden of proof that he had not unduly

influenced his mother in making the will. The confidential relation and the opportunity afforded therefrom to exercise undue influence may, of course, always be taken into consideration with other evidence, when the question of undue influence is in issue. But the relation itself and opportunity are not sufficient alone to warrant a finding that undue influence was actually exerted. Proof merely that confidential relations existed between a testator and the main beneficiary under his will is not sufficient to destroy its validity, but there must be some proof, in addition to the relation, of facts or circumstances showing the use of that relation at the time the will was made overcoming the free will and desire of the testator, in order to invalidate the testament."

The fact that Morcel went with the deceased to the office of the lawyer, when she executed the will, and was present while she gave her directions as to its provisions, and while she executed the same, is, of course, a circumstance to be taken into consideration in determining whether there was undue influence. There is, however, nothing to indicate that she went to Mr. Comte's office at the instigation or request of Morcel beyond the fact that he went with her, and he said that he went at her request and because she insisted on making a will and did not know where Mr. Comte, who had previously made a will for her, then had his office. It is clear that nothing occurred in the office of Mr. Comte that indicated that deceased was not acting entirely in accord with her own desire, uninfluenced by any one, and in view of the circumstances shown by the record, we cannot see that the mere fact that Morcel accompanied her to the office and was present while she executed the will afforded any ground for an inference of undue influence.

The effort to show that Morcel had, as it is put, "the master mind," and unduly controlled or had the power to unduly control the action of deceased, was not sustained by any substantial evidence. We have carefully examined the evidence offered in this regard and find it entirely insufficient.

The same may properly be said as to the effort to show that Morcel endeavored to keep the deceased and contestant apart. Concededly, up to the time when the final breach occurred there was absolutely nothing to indicate any desire or effort on his part to keep deceased and contestant away from one

another. On several occasions he had brought them together
again after a quarrel. The letter written to the husband of
contestant immediately after the final quarrel was but the
natural outburst of an affectionate husband who felt that his
wife had been outrageously treated, and that it was apparent
that it was useless to hope that the mother and daughter
would get along peaceably together, and that any meeting
between them would result only in distressing the mother.
Doubtless he retained this feeling to the end, but the only
evidence that he, subsequent to his letter, tried to prevent a
meeting, was the incompetent evidence given by Madame E.
Couturier to the effect that the deceased told her long after
the execution of the will that Morcel told her "she must not
call to see her daughter." The same witness testified that the
deceased told her that she did not speak to her daughter, that
they had different tastes and did not agree, that they were
both very angry at each other, and that the last quarrel they
had made her sick and unhappy. It is not surprising, in
view of the admitted facts as to the relations between mother
and daughter, and the effect on the mother of intercourse
with the daughter, that Morcel should have advised the mother
to keep away from her daughter, but there was no substantial
showing that he did anything more in that behalf. That
neither mother nor daughter desired to meet at any time after
the final quarrel was shown plainly enough.

The evidence which it is claimed tends to show that Morcel
prior to the final quarrel, sought to instigate differences be-
tween the mother and daughter by remarks calculated to in-
spire jealousy and suspicion on the part of the mother, with
a view to a final breach between them, was practically all
given by the daughter. In view of the conclusion of the
jury, we must assume the evidence so given to be true, but it
throws very little, if any, light, on the vital question of undue
influence operating at the time of the execution of the will.

We have now very briefly stated the matters shown by the
record upon which contestant must rely for a setting aside of
this will on the ground of undue influence. In the light of the
other facts shown by the undisputed evidence, they are entire-
ly insufficient for that purpose. At the time of the making of
the will, the mother and daughter, never bound together by
the ties common to that relation, had finally separated and

were bitterly antagonistic. This state of affairs continued for a month before the making of the will, and was ended only by the death of the mother fifteen months after. The mother made no secret of her intentions to keep from the daughter the property, to obtain which she believed was the only reason for any show of affection on the part of the daughter. The evidence of her declarations to this effect to others than Morcel, both before and after the making of the will, was uncontradicted. Under the circumstances, Morcel was the only remaining natural object of her bounty. The evidence does not warrant the conclusion that she was weakened as to either body or mind by age or disease to such an extent as to render her more subject to the influence of Morcel, or that she was in fact subject to his control in matters relating to her property. There was no concealment of the fact of the making of the will. Deceased made no secret of the making of the will, but openly declared that she had made it and that she had left her daughter only ten dollars and gave her reasons for thus cutting the daughter off with a nominal bequest. Having thus made such a will, she allowed it to stand for fifteen months, to the time of her death, without any expression tending to indicate a change in her desire as to the disposition of her property.

In the face of these facts that, in view of the evidence, cannot be disputed, there is, in our opinion, nothing in the evidence relied on by contestant that is capable of doing more at the most, than warranting a mere suspicion or surmise that undue influence *may* have been exerted in the matter of the execution of the will. This, as we have seen, is not enough to justify the setting aside of a will. In the absence of proof reasonably warranting the conclusion that the execution of the will has been obtained by undue influence, a verdict for the contestant on that ground must be set aside.

The judgment and order denying a new trial are reversed.

Shaw, J., Henshaw, J., Lorigan, J., Sloss, J., and Melvin, J., concurred.

Rehearing denied.