## ESTATE OF CAROLINE H. BAINBRIDGE, Deceased.

### [No. 10,419 (N. S.); 1914.]

**Fraud—Pleading—Necessity and Manner.**—Fraud is not judicable on implications or inferences; it must be expressly charged in the complaint by direct averment or allegation.

**Will—Mental Capacity of Testator—Will Itself as Evidence.**—On the question of the mental soundness of a testator, the will itself is evidence in connection with the sworn testimony of the draftsman that the deceased dictated the details to him.

**Will—Mental Incapacity of Testatrix—When not Shown.**—That a testatrix at the age of eighty-four was incompetent to dispose of her property is not shown by a witness who testifies: "Regarding money matters I formed a very strong opinion that she was in her right mind, for one thing, but in regard to other matters she did not seem to be right. But in money matters she seemed to be very strong."

**Will—Dotage on Part of Testatrix—Insufficiency of Evidence.**—That a woman in her old age recapitulates in her will her struggle to acquire a competence and expresses gratitude for aid received and a desire to reward through legacies those extending it to her, is not evidence of dotage such as to impair testamentary capacity.

**Will—Testamentary Incapacity—Gift to Strangers as Showing.—** That a woman of eighty-four by her last will seeks to benefit strangers in blood who have benefited her, instead of leaving all her estate to collateral relatives, does not tend to show that a life-long addiction to drink in excess and other bad habits have impaired her mind.

**Will—Undue Influence—Presumption of Exercise.—**It is not to be assumed that persons locally far separated from a testatrix exerted a personal undue influence over her or that persons about her exerted such an influence over her in the interest of the absent persons.

**Stipulation as to Evidence—Reference to Outside Facts.—**Counsel after signing a stipulation to the effect that the statement contains all the material evidence is in no condition to argue that the court should look outside for facts to base its decision upon.

**Will—Duty of Testator to Provide for Nephews and Nieces.—**An uncle or an aunt is under no obligation to provide for nephews or nieces either when living or by will.

**Will Contest—Burden of Proof.—**In proceedings to contest the validity of a will the burden of proof is on the person asserting the invalidity.

**New Trial—Duty of Court on Motion to Grant.—**The trial court is not only authorized but in duty bound, on motions for a new trial, to scrutinize the evidence carefully, in cases where claimed to be insufficient, and to grant new trials whenever, in its opinion, the evidence the decision or verdict was based on is insufficient to justify the conclusion.

**Will—Undue Influence—What Constitutes.—**A will is not to be set aside on the ground of undue influence unless there is proof of a pressure which overpowered and bore down the volition of the testatrix at the very time the will was made.

MOTION FOR NEW TRIAL AFTER VERDICT.

F. W. Sawyer, for contestant Mary J. Mayfield.

Henry Eickhoff (Lindley & Eickhoff) and Grant H. Smith, for executors.

Eustace Cullinan (Cullinan & Hickey), for certain legatees.

Grant H. Smith and A. G. Kazebeer, for certain legatees.

Burke Corbet and John R. Selby, for Grand Lodge of Masons, Oregon.

S. Bloom, for Roman Catholic Orphan Asylum, Beaverton, Washington County, Oregon.

T. E. K. Cormac, for Rev. Alexander Morrison, legatee.

COFFEY, J. Mary J. Mayfield, describing herself in the complaint of contest as a single person, filed her petition in this court on October 2, 1911, to revoke the probate of a certain instrument established and admitted herein primarily on the fourth day of October, 1910. The contest assailed the validity of the document for reasons set forth in fourteen pages of typewritten statement. After answer made, in due course, the contest came to trial before a jury, and upon the issues framed a verdict was rendered, which issues and verdict are here inserted.

## "ISSUES AND VERDICT.

"Was Caroline H. Bainbridge of unsound mind at the time when on the 8th day of September, 1910, she executed the instrument which has been submitted to probate as her last will in the above-entitled matter? YES. C. M. Elliot, Foreman.

"Were the mental faculties of Caroline H. Bainbridge so impaired by old age or by dissipation or by many years of the excessive use of intoxicating liquors or by physical disease or by the results thereof at the time when on the 8th day of September, 1910, she executed the instrument which has been admitted to probate as her last will in the above-entitled matter, that she could not and did not know what she was signing when she signed said instrument and could not and did not know the contents of said instrument at said time? YES. C. M. Elliot, Foreman.

"Was the mind of Caroline H. Bainbridge weak or debilitated or deranged to such an extent as to incapacitate her from making or undertaking a will at the time when, on September 8, 1910, she executed the instrument which has been admitted to probate as her last will in the above-entitled matter? YES. C. M. Elliot, Foreman.

"Was Caroline H. Bainbridge acting under undue influence exerted over her by Eugene F. McCarthy, Edwin C. Gould, and Mrs. Edwin C. Gould, wife of said Edwin C. Gould, or either of them, at the time when, on September 8, 1910, she executed the instrument which has been admitted to probate as her last will in the above-entitled matter? YES. C. M. Elliot, Foreman.

"Did the said Caroline H. Bainbridge, at the time of the signing of the will of September 8, 1910, sign the same under and by fraud of Edwin C. Gould, Eugene McCarthy, Emma Gould, or either of them?

"Answer: YES.

> "C. M. ELLIOT, Foreman.
> "CHARLES M. ELLIOT.
> "WILHELM BOGER.
> "VACLAV ZARUBA.
> "LAURENCE GLENNON.
> "JOHN RUSH.
> "THOS. G. JACQUES.
> "WILLIAM KEEGAN.
> "JOHN NAGELMAKER.
> "J. D. BOLGER.

"NO.

> "W. W. PARDOW.
> "MOSES HELLER.
> "WILLARD V. HUNTINGTON."

### EXECUTION ESTABLISHED.

1. The execution of the will, according to the statute, was clearly established; there was no evidence to the contrary, and this issue was withdrawn from the jury.

### NO ISSUE OF FRAUD.

2. There was no question of fraud raised by the contest and it was judicial error to submit such an issue to the jury.

The counsel for contestant, adverting in his brief to this issue, calls attention to the Estate of Ricks, 160 Cal. 468, 117 Pac. 539, in support of the verdict in this case. But in that case the supreme court remarked that the petition charged both undue influence and fraud. "The contest was based on undue influence and fraud." The fault found with the verdict was the failure to find on the issue of fraud. There were charges in that case of undue influence and fraud, and although they were intermixed, they were susceptible of separation mentally and issuable, in the absence of demurrer; but here there is no specific statutable charge of fraud. The cases are converse, in a sense; that is to say, in the Ricks case the jury failed to find on an issue raised by the plead-

ings, in this case the verdict was found on an imaginary issue, one not tendered nor denied, not joined. There is no copula.

I have carefully examined the complaint and find no charge of fraud, except as implied in undue influence, and these cases are not judicable on implications or inferences.

It is true that there is much matter in the complaint that might be obnoxious to demurrer, or subject to motion to strike out; but that does not relieve the court from obligation to consider only the essential issues raised by the pleadings; and an issue of fraud is not here discernible.

As to the rules of pleading in probate, see Estate of Goodspeed, 2 Cof. Prob. Dec. 146, 148–150.

### THE SUBMITABLE ISSUES.

Counsel for contestant contends that it is too late after verdict to raise this point and that respondents having permitted the question to go to the jury are estopped from now suggesting error; that they have waived their right, if any they had; but it is not a waivable point. It is one of fundamental error. It is not a case of bad pleading, which might be corrected or cured by verdict. It is a case of no pleading at all.

### WHAT A PLEADING SHOULD STATE.

A pleading should state a litigable issue by direct averment. In the complaint here there is no direct averment or allegation of fraud.

The submittable causes of action are (1) unsoundness of mind and (2) undue influence. In the issues presented there are some variations on the first of these issues that were probably based upon faulty pleading and that should have been eliminated from the form presented to the jury. They are evidentiary in character and, whether justified by the verdict or not, are merged in the main issue.

### DUTY AND ACCOUNTABILITY OF THE COURT.

The court itself is accountable for allowing such a form to be used; and it asks no acquittance, because the judge should not abdicate his function of preparing the proper issues to be laid before the jury.

The first issue is that of unsoundness of mind.

Plainly stated, as in the issue presented, Was Caroline H. Bainbridge, at the date indicated in the instrument, of unsound mind?

The complicated paper designated as a petition and contest of Mary J. Mayfield for revocation of probate of will asserts, preliminarily, some negatives pregnant as to execution of the instrument, all of which are a futile dalliance with the main issues.

### THE MAIN ISSUES.

The main issues are, to repeat, (1) unsoundness of mind, (2) undue influence; and, dealing with them, according to the pleadings and the evidence, we shall say, first, as to the pleadings, the allegations as to the mechanical execution of the instrument are utterly unsupported by the evidence. There can be no question on that score. Whatever doubt there may be as to its validity otherwise, a more carefully considered and composed document has not come before the court.

If the instrument be of itself evidence, it is shown here that the premises upon which the testatrix predicated her benefactions were entirely and wholesomely rational.

I have said that a more carefully considered and composed document has not come before this court. By this is meant, drawn according to the design of the testatrix. Was it her design? What does the evidence establish, so far as the execution exhibits? The proof as to the execution is perfect. All of the requirements of the law complied with. Not one of the allegations in paragraph III of the complaint was sustained by any sort of evidence. The testimony of the witness Warren was in no wise contradicted. (Statement 2, 3, 247–262.) The testimony of the original probate is in evidence, and, unless palpable perjury has been committed, the decedent dictated the details of the document to the draftsman. If this be so, the paper speaks for itself, and, in copy, is hereunto appended, and a synopsis herein inserted.

### THE INSTRUMENT ITSELF AS EVIDENCE.

It is difficult to conceive that such an instrument was the product of a mind impaired by senility or dissipation, or by years of debauchery, ''and of something of a worse character.'' (See page 26, contestant's brief.) What this quoted innuendo means is not clear from the record; but this is clear:

If we are to believe testimony of the witnesses present at the time of the transaction, and if we are to take the instrument itself in evidence, and to accept the statement of the draftsman as to the terms and circumstances of its dictation, the testatrix was capable of fairly and rationally considering the character and extent of her property, the persons to whom she was bound by ties of blood, affinity, or friendship, or who had claims upon her, or who were dependent upon her bounty, the persons to whom, and the manner in which she wished her property to be transmitted: Clements v. McGinn, 4 Cal. Unrep. 163, 33 Pac. 920; Estate McGinn., 3 Cof. Prob. Dec. 43.

There is no impeachment of the subscribing witnesses, although I may here repeat a remark frequently made in this court that it would be better if the draftsman and his associate were not subscribing witnesses.

### LAWYERS AND DRAFTSMEN AS SUBSCRIBING WITNESSES AND AS ADVOCATES.

It is at least embarrassing, especially where in a contest, the draftsman and witness as attorney and advocate is called upon to sustain his own handiwork as against shrewd and skillful contestation.

A lawyer can no more be his own advocate than a judge be the trier of a cause to which he is a party. Nor need he be, since there are lawyers in plenty and to spare, particularly in this jurisdiction, for there are eight and more in this case, certainly enough for all practical purposes. Indeed, one was enough for contestant as against the opposing octave, so far as the verdict went.

"In the multitude of counselors there is safety": Proverbs, XI, 14; 24, 6. In this matter it appears that the rule did not work with the jury.

Passing, however, this comment upon the usual local method of attesting wills and omitting any reference to other criticisable circumstances of customary methods, which this court has alluded to in contemporaneous cases, we are to consider the proof as to unsoundness of mind.

The will itself is in evidence, and in light of the rules of law, as laid down by the supreme courts, by the testamentary provisions we may test the sanity of the testatrix. Whatever

her personal history may have been, it is impertinent to inquire, for of this, in absence of evidence, this court has no right to judge and no reason to infer.

#### THE ELEMENT OF AGE AS TO TESTAMENTARY CAPACITY.

She was a woman far advanced in age, about eighty-four, when the paper propounded was executed. Age is not necessarily an element of testamentary disadvantage. It is sometimes of consequence to the commonwealth to fix a period to official activity and to retire even judicial incumbents at an age arbitrarily fixed; but we all know that some of those judges so sacrificed have done their best work after such enforced retirement. Chancellor Kent improved the opportunity of such a fate by perfecting his commentaries, and others too numerous to particularize have shown that age does not necessarily wither their capacity. Allusions might be made locally, but they are too obvious. In this case the reference to the extreme age of this testatrix as an indication of incapacity might be answered by a witness upon whom contestant seems largely to rely, Chief of Police White. On page 26 of contestant's brief, after a vivid description of testatrix, counsel says "her mind became so weak she was offering her property to any chance acquaintance, the Chief of Police, Mr. White, and others, until she had forgotten the natural objects of her bounty."

#### MENTAL CAPACITY OF TESTATRIX.

Turning now to the testimony of David A. White, Chief of Police, witness for contestant, what does he say on the score of testamentary capacity? He was not a chance acquaintance. Substantially he had known her for twelve or fourteen years prior to her death; last saw her seven or eight months before she died. In response to a direct question as to her mental condition, Chief White said: "Regarding money matters I formed a very strong opinion that she was in her right mind, for one thing, but in regard to other matters she did not seem to be right. But in money matters she seemed to be very strong."

So it seems she was sound on that issue. This whole case is a matter of money.

In the cross-examination, he said she was very keen-minded about her business affairs; extremely so; crafty about money;

spoke about her money affairs; discussed the different parts of her property; said, at the last time he saw her, that she was going to leave her property to Mr. McCarthy. (Bill of Exceptions and Statement, p. 227.)

### PERSONAL HABITS AS AFFECTING MENTAL CAPACITY.

It is argued that the mind of the testatrix was so impaired by a lifelong addiction to drink to excess and other habits obscurely intimated, that at the age of eighty-four she had lost capacity to comprehend her obligations to those who, by nature, were entitled to consideration; and there is much philosophistication in the discussion as to the effect of such a course of life on the mental character.

As an abstract essay on such a subject the brief of counsel is interesting and instructive, not only in reference to this particular point (pages 26–29), but going back to page 15, beginning with line 12, as to the characterization of "dark people" as "born intriguers, schemers, and plotters."

No doubt there is much value in this animadversion, because, necessarily, all such transactions are done in the dark of the moon and cannot stand the noon-day light, and it is perfectly proper that in such a case the sunlight of evidence should be brought to bear upon them, and counsel has been diligent in this direction.

But the testatrix, notwithstanding her imputed infirmities and frailties had lived a long life; she may have been weak and erring morally; she may have been self-indulgent in her youth and in her maturity to an extreme; but she had accumulated a fortune, and what does she say about that in what up to the date of the verdict passed for her autobiography?

If she was a woman of the character insinuated it is not established by the evidence, and this case, as all cases should be, is to be tried by the record.

### WHAT IS THE RECORD?

Most importantly, in the first instance, the record is the paper propounded and primarily proved as a will.

As the court reads from the record and from the inspection of the document, its mechanical execution was according to law.

Prior to the instrument now in dispute another paper had been executed in similar circumstances, same witnesses; a few days subsequently, on account of some error, in the first document, a corrected will was signed.

It seems that the testatrix desired a change in a provision and at her instance a new instrument was prepared and perfected. (See pp. 2-6, Statement.) After the change made the paper was engrossed, taken to her room in the hotel which she owned, read to her, signed by her, witnessed twice, first adjacent to her signature, and again after a formal attestation clause; she attached her initials to the margin of each page in the presence of the witnesses. The attestation clause was read to her. (See pp. 247-262, Statement.) There is no contradiction of this testimony.

In the Estate of Ricks, to which counsel for contestant invites the court's attention (p. 4a, Brief), the supreme court alludes twice to the mental character of the testatrix. Mr. Justice Lorigan, always thorough in his treatment of the cases presented to him, leaving no point overlooked, alludes to Mrs. Ricks as a woman of remarkable mental power, although averse to business cares and responsibilities; of decided opinions, perfectly capable of knowing and understanding what she was doing with respect to any matter (160 Cal. 458), a woman of firm will and decisive mind; of remarkable intellectual powers; fully capable of understanding and knowing what she was doing at all times.

"No question is made about her mental capacity at the time the will was executed. There is not a pretense that she was then mentally infirm, and her will, as far as its provisions are concerned, expresses clearly her intention as to the disposition of her property. There is nothing in the will itself which suggests any undue influence in making it": Estate of Ricks, 160 Cal. 462, 117 Pac. 532.

### THE TOUCHSTONE OF CAPACITY.

Taking the testament as the touchstone of the capacity of testatrix and accepting as an authority this citation, how does it compare with the contention of contestant?

The will itself shows exquisite appreciation of aid extended to her and service rendered in early days when she was in need or difficulty. It manifests in the highest degree the

quality of gratitude inherent in her character. In the twenty-third clause of the instrument, after she had made her dispository provisions, she declares that she had sought in this her last will and testament to dispose of her property according to her wishes.

"All that I have was earned and saved during many years of hard work. I have during the years of my life received kindnesses and help from persons who are strangers to me in blood, and I have sought in this will to remember them and to indicate to them that I have not forgotten any consideration shown. What property I have is mine, to do with as I believe best, and I have always thought that, in the event of my death, no better disposition could be made of my property than to divide it among those who were kind to me and who need assistance."

If that clause be the emanation of her brain, it is expository of the precedent provisions, and could never have come from a mind diseased or subject to delusion. If she dictated it, or gave instructions to the draftsman tantamount to dictation, it was the product of a healthy mental constitution and signified not only a sound mind but a heart full of gratitude to those who had bestowed favors upon her.

"Gratitude is the fairest blossom which springs from the soul; and the heart of man knoweth none more fragrant."

This clause substantially ends the testament which begins with the usual formal phrases and the declaration that she had no husband, he having died many years before, and no descendants; the only child she ever had died in infancy in New York state many years before, and was buried in Calvary cemetery, a burial place of the Roman Catholic church in New York City; but she knew of a practice often resorted to by designing persons to make claim to relationship by marriage or by descent, and therefore she declared to the world that she had no husband or lineal descendants living.

### SYNOPSIS OF WILL.

She then proceeds to make her bequests and gives reasons for each, full and satisfactory, certainly not fanciful, although some may be said to be sentimental. It is worth while to summarize them: To Douglas Ladd, son of R. J. Ladd, formerly of Portland, Oregon, she gives $1,000, in

recognition of many kindnesses shown to her by him during the time when she was sick at the Imperial hotel in that city, where he was bookkeeper and was very kind and considerate to her. To the Fireman's Relief Fund of Portland, $2,000, in recognition of a gallant effort to save her property in that city years before; she had much admiration for the men of that department, with many of whom she had been acquainted. To Seneca Smith, a former judge in Portland, she left $1,000, because he was an old friend for whom she had a high regard. To John B. Cleland, a judge of the superior court of that section, she bequeated $2,000, having a great admiration for him as an honest, upright judge, and she advances a specific reason in this behalf, that at one time some important litigation with regard to property which she owned in Portland was tried by him, and although she had never met him before or since and never saw him except in the courtroom, she was much impressed with his fairness and his desire to do right, and she made this bequest to attest the high esteem in which she held him as an honest judge. To Albert Reiners of Brooklyn, New York, formerly of Portland, Oregon, she gave $2,000, because he was always kind to her and showed her much consideration and did many little services for her; and she further advances as a reason for this bequest that since the fire he had lost his right hand, which prevented him from earning a living at his trade and she did not believe that the amount so bequeathed could be put to a better use. She also gave to him certain certificates of mining stock, making this particular bequest because the shares were purchased by her from him and she desired him to have them back. To Rev. Alexander Morrison, a Catholic priest in Mallow, Cork, Ireland, she left $1,000, because he took care of her mother in her last illness and during the time that she was an invalid; testatrix had a deep respect for Father Morrison and was very grateful to him for the kindnesses that he showed to her mother. To the Grand Lodge of Masons of Oregon she gave the lot in Lone Fir cemetery wherein reposed the remains of Eugene Augustus Cronin and likewise $500 to keep it in order. To the Roman Catholic orphan asylum at Beaverton, Washington county, Oregon, she gave $1,000, because she believed it to be a very worthy institution and desired to assist it in a small way.

To the sisters of the Good Shepherd of Clackamas county, Oregon, she left $1,000, because she believed that the work carried on by them in Clackamas county was a most worthy one which should be encouraged and she desired to help it. To her friends John Slater and Susan B. Slater, his wife, she gave $1,000 each, because they were her tenants for ten years and were very kind to her. Mr. Slater had saved her papers at the time of the fire in April, 1906, and Mrs. Slater had accompanied her to the hospital at that time. Testatrix recites that they have a little mortgage on their home, and are hard-working people, worthy and deserving, and the bequests will be of assistance to them and she knew the money would be put to good use. To Rev. D. O. Crowley she gave $5,000 to be expended by him in such manner as he should deem best for the benefit of the Youths' Directory, which he has fathered. She made this bequest because, while she had never met him personally, she admired the great work in which he was engaged. She gave to her nephew, James Sullivan, of Seattle, Washington state, $1,000; she would have given more were it not for the fact of his being well supplied with this world's goods, and needed no assistance from her. She bequeathed to Patrick Quinlan of Summersworth, New Hampshire, a nephew, $1,000, without assigning any reason therefor. Similarly she gave to Joseph James Quinlan, of Boston, Massachusetts, a nephew, $1,000. To Mrs. Mary J. Mayfield, formerly Mary J. Quinlan, a niece, of San Francisco, $1,000. To Mrs. Annie Turney, formerly Quinlan, of San Francisco, a niece, a like sum. To her friend Herbert B. Keith, an insurance agent of San Francisco, $3,000. All the remainder of her estate to her nephew Eugene Francis McCarthy, the son of her deceased sister, Mary McCarthy. Following these provisions, she directed that in the event of the death of any devisee or legatee before receiving the devise or legacy it should go to those who should inherit the estate of such devisee or legatee. Then she directs that in case any legatee or devisee should contest the will or any of its provisions, such person should take nothing thereunder and the will should be revoked as to such contestant. Finally, her nephew Eugene Francis McCarthy and Stuart F. Smith are named executors without bonds and with full powers. Then

follows the clause explaining the general reasons why she made the dispositions hereinabove summarized.

In nearly all of the provisions she gave specific reasons, but she concluded with the statement already recited.

### THE FACULTIES OF THE MIND.

Is it conceivable that the person who dictated and signed that instrument was of unsound mind? We are told that the faculties of the mind are will, memory and understanding. If she made that will as written she demonstrated the possession of all of those faculties.

In the introductory clause to the instrument she says:

"In the Name of God, Amen. I, Caroline H. Bainbridge, also known as Caroline Hannah Bainbridge, being of sound and disposing mind, and not acting under any duress, menace, fraud, or undue influence of any person whomsoever, do make, publish, and declare, this to be my last Will and Testament."

While this is, as has been said, the usual formal phraseology, it may be noted that the entire instrument was read over to her in its first form and in its final correction and engrossment and it must be presumed that she understood the import of its terms. She certainly was an intelligent woman, if not finely educated. She had a reverence for the Deity; a regard for the institutions and obligations of religion; notably recognizant of its benevolent and charitable organizations and enterprises.

### NO UNDUE INFLUENCE AS TO BENEFACTIONS.

So far as those objects of her benefactions were concerned, it is not pretended that she was unduly influenced; many of them were far afield from her at the time of the execution of her will; it is absurd to suppose that Douglas Ladd, the Portland Fire Department, Seneca Smith, Judge Cleland, Father Morrison, Albert Reiners, or the other beneficiaries unrelated to her consanguineously or affinitously, had any influence directly or indirectly with her testamentary disposition. She gave a reason showing understanding and strength of memory for each of these bequests. It is not at all likely that there was anyone about her to sharpen her recollection of what they had done to earn her gratitude.

The record does not disclose that anyone even knew why she recalled in such circumstantial minutiae the grounds of her regard for the persons mentioned.

### REMEMBERS ALL HER KINDRED.

Nor did she forget her collateral kindred, although they are not necessarily the objects of natural bounty; she remembered every one; she discarded none, although she had a right to discriminate as to their relative equitable or moral claims upon her consideration. It cannot be presumed that a testatrix was of unsound mind because she discriminated against her heirs in the disposition of her estate: Estate of Dolbeer, 3 Cof. Prob. Dec. 232. This is especially true of collateral heirs who have no natural claims upon her bounty: Estate of McDevitt, 95 Cal. 31, 30 Pac. 101.

### NOT AN UNDUTIFUL WILL.

This will is not an undutiful will. Not to divide property among nephews and nieces does not make it an inequitable will. An uncle or an aunt is under no obligation to provide for nephews or nieces either when living or by will. Decedent had no descendants, no one for whom a natural duty rested upon her to provide. Nevertheless she did make provision for each and all of the collaterals. So far as the will itself is concerned, it shows a sound sense of equity and ethical ratios.

### BILL OF EXCEPTIONS CONCLUSIVE—STIPULATED RECORD.

Counsel for contestant says on page 38 of his brief, lines 21, 22, that the statement in this case does not present all the evidence. This is a suggestion of diminution of the record. It is rather late to make this suggestion in view of a stipulation by all the counsel, bearing his authentic signature, that the engrossed bill of exceptions and statement on motion for a new trial is true and correct and may be settled and allowed to be used on this motion, and it was so settled and allowed by the court. (Statement, pp. 260, 261.)

It should seem that he is now estopped from questioning his own solemn act. The counsel and the court are bound by the record as thus established.

But the counsel makes a rather curious comment in this regard, which, perhaps, the court should notice because of its peculiar character.

"In passing upon this motion for a new trial we are confined to the statement, and if the statement shows omitted evidence, how then can this court say that the omitted portions were not sufficient or contained sufficient evidence to justify the verdict? The jury had this omitted evidence, it passed upon it, it was a part of its consideration; for aught we know it was overwhelmingly in favor of the contestant. Without these omitted portions of the evidence, this court should not attempt to pass upon the evidence as to whether or not it was sufficient to justify the verdict of the jury."

If this be so, there is no sanctity in a stipulation.

### MEANING OF STIPULATION.

What is a stipulation? In the Roman law it was a verbal contract and was in that jurisprudence considered the most solemn and formal of all contracts. It was from month to month, *ore tenus*; and, in that sense, in early times at this local bar it was considered as if in writing under seal; that is tradition; but times have changed and now a stipulation is, in practice, an engagement in writing fastened by the signatures of the parties thereto, and even then, in some instances, seems to be repudiable. Once a man's word was his bond, but we have changed all that; and the primitive methods have given way to a condition in which a solemn obligation scripturally incased has no more validity than the vapor of the breath of an inebriate.

The law, however, remains to communicate virtue to the script, and it will not allow the court to exercise its imagination by supplying the alleged omissions in the stipulated statement. This the court cannot do; and in the request there is an implied admission that the agreed statement of evidence does not support the verdict.

### BURDEN OF PROOF.

The burden of proof is upon the contestant. This is a truism, and the jury were instructed in stereotyped manner as to what that fixed form of phrase meant. It seems almost an idle ceremony to repeat such so-called instructions.

This court concurs with counsel for contestant in his pane-gyric upon the jury system (page 31 of Brief), and it is undoubtedly the palladium of the liberties of the people and the safeguard of the state; and anyone, as counsel says, who dares to assail this invaluable popular prerogative will live to regret his vain words. The incivist who has the temerity to criticise this institution has colorless corpuscles instead of red blood in his veins.

It is no argument against the jury system that occasionally a verdict is set aside, any more than it is against the judge that his decision is often overruled; indeed, it may be said that there are more mistrials from judicial error than from erroneous verdicts; and less excuse for them, for the judges are supposed to be specially trained and the jurors come from various avocations not connected with the vocation of the law. It is no impeachment of their integrity, if they be held mistaken in a verdict as to a matter of fact depending on questions of law.

### NO IMPEACHMENT OF JURY SYSTEM.

The jury in this case were men of intelligence and the foreman chosen by them was a bright business man, known to the court, and all of them entitled to its respect; but after they had deliberated for hours, and been accorded the opportunity of nourishing their corporal system, they brought in a verdict on one issue only, the first in the series. They were not starved into a verdict; they were not deprived of food or fuel, or given only bread and water; they had been given a generous diet on the American plan, with a soupcon of French, and took ample time to digest their dinner and the issues. In England or Ireland they might have been lectured by the court for their delay; indeed, lately one of the law reports contained severe strictures by the court upon the jury's remissness in occupying an hour and a half in a luxurious luncheon while the judge sat awaiting a verdict munching his crackers and cheese and small beer in his chambers. The chief justice sitting in circuit administered a rebuke which would not be tolerated in this country. Here in this instance when the jury rendered their verdict the court, observing that they failed on all but one issue, was mildly remonstrant at this dereliction and suggested a return to their delibera-

tion room to complete their verdict, which otherwise would have been abortive. Shortly thereafter they returned and found on all issues, by nine to three, as above recorded.

Whether they were vexed at the reproof of the court or not does not, of course, appear; still it may be inferred that the majority of the jurors were not pleased; but passion and prejudice are not to be predicated upon an incident of this kind.

### JUDGE'S DUTY ON MOTION FOR NEW TRIAL.

The ideal judge would not have evinced any impatience in such a case; he would have remained impassive, placid, even frigid, not discomposed, but rather decomposed, in such a situation; in a sort of judicial *rigor mortis;* for in our modern system in a jury trial a judge is a nonentity; he has to do nothing but nod; in ruling upon points of evidence he acts almost automatically; as an eminent president once said, he has nothing to do but doze upon the circuit.

It is different, however, when it comes to pass upon a motion for a new trial, as is attested in this case. Then the ideal judge becomes real and he must exert his intelligence and practically act as judge and jury and try the case all over again.

If in such circumstances he is so patriotic as to praise the jury system, it proves conclusively that he has enough of good American blood left in him to declare that that system is the greatest protection in any government of the weak and helpless as against the arrogant attitude of the unthinking and unfeeling possessors of power and wealth.

Counsel for contestant, in his very able presentation of his case, says "the supposed right of the trial judge to weigh the evidence and set aside a verdict because the jury, selected for that purpose, has decided the conflict contrary to his opinion, is a supposed right, if law, unconstitutional"; and, upon this basis, counsel declares that "there is no law and there never was intended to be any law that gives the trial judge this power." (Contestant's Brief, pp. 34–37.)

### THE RULES OF DECISION.

In his argument counsel is exceedingly ingenious, and if this were a matter not settled by the supreme tribunal, this

court might find in his favor; but the trial judge must conform to the rules of decision laid down by his superiors.

It may be conceded, for the purposes of this contention, that the law is unconstitutional, and that the appellate court, in usurping the functions of the jury, or the trial court in this class of litigation, is amenable to criticism, but still it is the supreme censor, and, whatever our private opinion may be, we must yield to its judgment.

The code says that a new trial may be granted when there is insufficiency of evidence to justify the verdict: Code Civ. Proc., sec. 657.

The supreme court has said in many cases, one for all may be quoted, that it is a well-established rule and often reiterated that the trial court is not only authorized, but it is its duty, to carefully scrutinize the evidence, on motion for a new trial, in cases where the evidence is claimed to be insufficient, and to grant a new trial, whenever in its opinion the evidence upon which the decision or verdict is based is insufficient to justify the conclusion: Lyon v. Aronson, 140 Cal. 367, 73 Pac. 1063.

This is a well-settled rule, that if the verdict is contrary to the weight of the evidence, it is the duty of the trial judge to grant a new trial. The cases are numerous to this point; none to the contrary: Estate of Motz, 136 Cal. 560, 69 Pac. 294.

Counsel for contestant criticises with great power the rationale of these decisions, and undertakes to show that not only the statute falls short of conferring upon the trial judge this faculty of revision and reversal, but that it does not mean what it says, and, in a scholastic manner, he draws the distinction between evidence and proof, and academically argues as to what is meant by that section.

It is not, however, prudent nor expedient for a subordinate court to criticise or question in any manner the decision of its superior. That is the ultimate point of view. "When Rome has spoken, the controversy is ended." The supreme court is infallible, even if it be four to three in the state, or eight to seven in a matter concerning the most important issues of federal interest. This is said seriously and with respect, because otherwise our institutions could not survive. Whatever may be our private or personal opinions, we should

obey without hesitation the decree of the tribunal created by the people through their constitution for their own protection. Hence this court cannot accept the criticisms of counsel for contestant upon the doctrines defined by our courts of last resort. We are not at liberty to discuss the authenticity of their premises or conclusions. A certain distinguished judge of the local superior court, formerly a chief justice, was once congratulated upon the affirmance of his judgment by the appellate tribunal, and he remarked that while it was true they had affirmed his decision, it was upon grounds exactly contrary to the reasons upon which he had based his conclusion; but nevertheless it became the law of the case.

### DISTINCTIONS BETWEEN EVIDENCE AND PROOF.

Counsel indulges in some distinctions as to evidence and proof; but the simple rule of our code is that testimony is the evidence given by witnesses, of a certain species, and proof is the effect and result. These terms are technical, but are easily interpreted and understood. It is not necessary here to engage in a discussion as to their differential import. It is sufficient to cite the statute: Code Civ. Proc., secs. 1823, 1824.

Testimony is one species of evidence; but the word "evidence" is a generic term, which includes every species. The word "proof" means, shortly stated, the result of these species. Testimony furnishes evidence; evidence generates proof. Proof means that which convinces the mind of the truth or falsity of the issue tendered. This is hornbook law. No citation needed.

If in this case the evidence fell short of the proof requisite to establish any issue the court should, as to that issue, set aside the verdict; and this court has no doubt, non obstante veredicto, that at the time of the transaction the testatrix was in full form and faculty.

Granting this conclusion, was the testatrix unduly influenced?

### WAS THE TESTATRIX UNDULY INFLUENCED.

Is it necessary to recapitulate the evidence? Is there any evidence suggesting undue influence on the part of the main beneficiary? Is there a particle of proof that he exerted

undue or any influence? Gould was not a beneficiary; he may be all sorts of a rogue, but is he interested in this testament? That is the point. Is it established?

Sometimes counsel seem to forget, in this class of cases, where the burden lies, and apparently think that an allegation of itself alone imposes an obligation upon the respondent primarily to establish the contrary, without proof affirmatively; but the rule is otherwise.

It is almost wholly discretionary to grant or refuse a new trial; but no court should exercise this discretion by merely saying "granted" or "denied." Some reason, even if not absolutely required, should be given, in justice to parties litigant; especially where they have expended so much time and energy, as in this case, in elaborating their arguments. Therefore this court has extended an opinion otherwise unduly verbose.

### WHERE THE BURDEN LIES.

The authorities are innumerable, indeed it needs no authority, for the statute so says, that the burden of proof is upon the contestant, and it cannot be transferred or shifted: Code Civ. Proc., sec. 1981. The burden is on contestant to establish by preponderance of evidence the issues tendered. This is the law as laid down by the supreme court from the first to the latest of the reports, without the parting of a hair in variation, and it is aided by the legal presumption, if aid were necessary in a proposition so elementary, that every person is of sound and disposing mind and free to act testamentarily, and in a will contest respondents are entitled to such presumption as a matter of evidence. The burden is upon contestant to establish facts from which an inference of undue influence can reasonably be drawn: Estate of Morcel, 162 Cal. 188, 121 Pac. 733.

### WHAT IS INCUMBENT UPON CONTESTANT.

It is incumbent upon contestant to show this clearly, that the undue influence alleged operated upon the very act. This proof must be so manifest as to carry conviction and leave no manner of doubt as to the fact.

The unbroken rule is that the courts must decline to set aside a will upon the ground of undue influence unless there be proof of a pressure which overpowered the mind and

bore down the volition of the testatrix at the very time the will was made. There is no such proof here. An attentive hearing and a careful reading of the testimony fails to disclose any evidence tending to show the exercise of undue influence or the commision of fraud. There is a total want of testimony that would justify an inference that any of the beneficiaries undertook to influence the testatrix in any manner whatever.

### NO SUFFICIENT BASIS FOR VERDICT.

Undue influence or fraud sufficient to set aside a will must have been perpetrated by or with the connivance of a beneficiary. There is absolutely no testimony in this case in that behalf. So far as the evidence shows, this will was the product of Caroline H. Bainbridge's free and independent volition. Certainly there is nothing to indicate that she acted under pressure which destroyed her free agency. Nothing less than this is undue influence. This is the substance of all the California cases. There is no showing here that the persons benefited had any share in the execution of the will; but it is fully proved that the design of the testatrix in every particular was faithfully accomplished.

It is not necessary to engage in an analysis of the evidence. Without discrediting any witness, or disparaging his sincerity, the result of a careful examination of the testimony, even of the witnesses introduced by contestant, shows no sufficient basis for the verdict.

Courts should be careful of imputing inveracity or even interest or bias to witnesses; they may be mistaken and from the side of the shield that they survey positive as to its color or composition, but they are not necessarily perjurious. They may be a little piqued because they have not been remembered to the extent of their anticipations in the document disputed; they may have mistaken the hospitality of their host as their right to testamentary recognition; and many similar circumstances of disappointment may conspire to infect their own minds as to the mental character of a testator or testatrix; but upon the whole record we must reason out the result; and, in this case, there is no doubt that the evidence was insufficient to support the verdict upon any issue.

Motion granted.

This Case was Affirmed by the supreme court January 26, 1915: 169 Cal. 166, 146 Pac. 827.

For authorities upon the questions therein involved, see Estate of Casey, 2 Cof. Prob. Dec. 68, and notes.