## SHELBY *et al.* v. FARVE *et al.*

No. 1851.   Opinion Filed June 25, 1912.

Rehearing Denied October 1, 1912.

(126 Pac. 764.)

1. **INSANE PERSONS**—"Incompetent"—"Mentally Incompetent" —"Incapable." The phrases "incompetent," "mentally incompetent," and "incapable," as used in article 15, c. 86, secs. 5485, 5486, Comp. Laws 1909, mean any person who, though not insane, is, by reason of old age, disease, weakness of mind, or from any other cause, unable, unassisted, to properly manage and take care of himself or his property, and by reason thereof would be likely to be deceived or imposed upon by artful or designing persons.

2. **SAME**—Guardian of Estate—Appointment. Under the provisions of sections 5485 and 5486, Comp. Laws 1909, the county court alone is authorized to appoint a guardian of the estate of a person who is mentally incompetent to manage the same, although such person may be able to care for his person, whenever it appears that by reason thereof he would be likely to be deceived or imposed upon by artful or designing persons.

(Syllabus by the Court.)

*Error from District Court, Marshall County;*
*D. A. Richardson, Judge.*

Action by David Shelby and others against Marcelene Farve and others. Judgment for defendants, and plaintiffs bring error. Reversed and remanded, with instructions.

*W. J. Gregg,* U. S. Atty., and *J. C. Denton,* Asst. U. S. Atty., for plaintiffs in error.

*H. A. Ledbetter,* for defendants in error.

DUNN, J.   This case presents error from the district court of Marshall county. On May 29, 1909, the plaintiffs in error filed a petition in the county court of the said county asking for the appointment of a guardian or guardians of Marcelene Farve and Stella Farve, defendants in error, on the ground that they were mentally incompetent to manage their property. Thereafter, and on June 15, 1909, the said county court, on a hearing, found:

"The said Marcelene Farve and Stella Farve are both adult fullblood Mississippi Choctaw Indians, that each of them is ignorant, uneducated, and mentally incompetent to transact her business and to manage her property, and the court further finds that the said Marcelene Farve and Stella Farve own by inheritance from their mother Melvina Jackson an allotment of the tribal lands situated in Carter county, Okla., on which are valuable asphalt deposits, and that, by reason of said asphalt deposits, said allotment of land is of the value of $40,000 or more. The court further finds that there is now a mineral lease on said lands and revenues arising therefrom in the way of royalties amounting to from $900 to $1,200 a year. The court also finds that the said Marcelene Farve and Stella Farve have attempted to sell said lands for a grossly inadequate consideration, and that, unless a guardian of their estate is appointed, they are liable to sell their interests in said estate for a grossly inadequate consideration, and that it is proper and necessary that a guardian be appointed to take care of and protect their said property."

From this order the defendants in error appealed to the district court on questions of law and fact. On November 27, 1909, the petition came on for trial *de novo* before the court without a jury. At the conclusion of the evidence, the defendants in error filed a demurrer thereto on the ground that the same was insufficient to warrant the appointment of a guardian under the statutes of Oklahoma, which demurrer was by the court sustained, and the case, after denial of motion for new trial, has been brought to this court for review.

On passing on the demurrer, the court found from the evidence that the defendants in error were competent to take care of themselves so far as their persons were concerned, but that they were so ignorant in so far as the value of property was concerned that it was probable that they would, if permitted, make an improvident disposition of the same. The court held that it was not warranted under the law to appoint a guardian over the defendants in error for the sole reason that they were incapable of managing their property, for the reason that it was authorized to do so only when the persons were shown to be mentally incapable of taking care of both their property and their persons. So that the question as it presents itself to this court is the extent of the jurisdiction vested in county courts to appoint

guardians for the estates of mentally incompetent persons, although it may find that the evidence is not sufficient to warrant the appointment of a guardian over their persons.

Section 13 of article 7, para. 198, Williams' Ann. Const. Okla., provides:

"The county court shall have the general jurisdiction of a probate court. It shall probate wills, appoint guardians of minors, idiots, lunatics, persons *non compos mentis,* and common drunkards; grant letters testamentary and of administration, settle accounts of executors, administrators, and guardians; transact all business appertaining to the estates of deceased persons, minors, idiots, lunatics, persons *non compos mentis,* and common drunkards, including the sale, settlement, partition, and distribution of the estates thereof. * * * "

Section 5485, Comp. Laws 1909, provides:

"When it is represented to the county court upon verified petition of any relative or friend, that any person is insane, or from any cause mentally incompetent to manage his property, the judge must cause notice to be given to the supposed insane or incompetent person, of the time and place of hearing the case, not less than five days before the time so appointed, and such person if able to attend, must be produced before him on the hearing."

Section 5486, *Id.,* provides:

"If after a full hearing and examination upon such petition, it appears to the judge of the county court that the person in question is incapable of taking care of himself and managing his property, he must appoint a guardian of his person and estate, with the powers and duties in this article specified."

The question is presented and argued by counsel for plaintiffs in error that these sections of the statute, which were laws of the territory of Oklahoma, were not repugnant to the Constitution nor locally inapplicable, and hence were by section 2 of the Schedule to the Constitution extended to and remained in force in the state of Oklahoma, and in this contention we concur. And it is further insisted by counsel that notwithstanding the fact that the language of section 5486, *supra,* provides that, "if after a full hearing * * * it appears to the judge of the county court that the person in question is incapable of taking care of himself and managing his property, he must appoint a guardian,"

under the general probate powers conferred upon the county court the jurisdiction exists to appoint a guardian for the estate of one mentally incompetent or incapable of managing his property, although such person may be competent to care for himself. This question does not appear to have arisen before, nor received the consideration of, the courts of the territory or of this state. It was, however, presented to the Court of Appeals of Missouri in the case of *Easley v. Bone,* 39 Mo. App. 388, wherein a statute similar to that before us was before that court for consideration. Section 5791, Rev. Sts. of Missouri 1879, relating to this subject, reads as follows:

"If it be found by the jury that the subject of the inquiry is of unsound mind and incapable of managing his or her affairs, the court shall appoint a guardian of the person *and* estate of such insane person."

The question involved in that case was the same as here, the authority of the court to appoint a guardian for the estate of a party without embracing within it the guardianship of his person. It is to be noted that the question is one of power and jurisdiction, and on this Judge Seymour D. Thompson, who prepared the opinion for the court, said:

"We have come to the conclusion, though not without some hesitation, that where a person has been adjudged insane, in conformity with the statute, and no one can be found who will accept the office of guardian of his person because of his dangerous character, the court has power, for the purpose of conserving his estate, to appoint a guardian of his estate merely; and we attach no importance to the fact that the order of appointment designates the appointee as 'curator' instead of 'guardian'; the meaning of the two words, when applied to the care of an estate merely, being the same. A very strict reading of the statute might lead to the conclusion that the grant of jurisdiction is to appoint a person who shall be at once guardian of the person and of the estate of the insane person; but we think that it is capable of being read in conformity with the mathematical axiom, that the whole includes all its parts, so as to reach the conclusion that a grant of jurisdiction to appoint a guardian of the person and of the estate includes a jurisdiction to appoint a guardian of the estate only, where insurmountable obstacles preclude the appointment of a guardian who will act in both capacities."

The question is solely one of jurisdiction and authority. If this is lacking, the power to appoint a guardian for the estate without at the same time including the person therein would be wanting, no matter what the cause.

It is to be noted that the court found specifically that the parties for whom the guardian was sought were so ignorant in so far as the value of their property was concerned that it was probable that they would make an improvident disposition of the same. The question therefore arises, Is this finding of fact by the trial court sufficient to bring the parties within the language of sections 5485 and 5486, *supra*, that they were *mentally incompetent* to manage their property or *incapable* of managing their property? These identical statutes are contained in the Code of California, being sections 1763 and 1764, Kerr's Cyc. Codes of California. The Legislature of that state has undertaken to define the meaning of these words, and section 1767, *Id.*, provides:

"The phrase 'incompetent,' 'mentally incompetent,' and 'incapable,' as used in this chapter, shall be construed to mean any person who, though not insane, is, by reason of old age, disease, weakness of mind, or for any other cause, unable, unassisted, to properly manage and take care of himself or his property, and by reason thereof would be likely to be deceived or imposed upon by artful or designing persons."

This definition in our judgment fairly expresses the meaning intended by our Legislature when these provisions were passed. Our own statute (section 5033, Comp. Laws 1909) defines persons of unsound mind as being "idiots, lunatics and imbeciles." It is clear that these parties do not come within any of those definitions, but it seems to us that the finding of the court that they were so ignorant in so far as the value of their property was concerned that it was probable they would make an improvident disposition thereof is the situation contemplated by the statutes under which this proceeding was brought, and that it is amply supported by the evidence.

Upon examination, Marcelene Farve, called on behalf of petitioners, testified in reference to her land:

Shelby et al. v. Farve et al.

"Q. Has anybody ever tried to buy it from you? A. Yes. Q. Who? A. One time we sold it to George Criner. Q. How much did he give you for it? A. He was aiming to give me $450, but he didn't give me all, he just gave me $350, and gave me hundred dollar note. Q. Was that for your full interest in the land? A. Yes. Q. And were you willing to sell it to him for that price? A. Why, yes. Q. Did you sign a deed? A. Yes, sir. Q. Do you own a half interest in that land? A. No. Q. What interest do you own? A. I don't know. Q. Do you know what interest you own in that land? A. No, sir. Q. Have you got any brothers? A. No, sir. Q. How many sisters have you? A. Just one. Q. What's her name? A. Stella Farve. Q. These the only children your mother had, you and Stella? A. Yes, sir. Q. And you were going to sell your interest in that land to this man Criner for $450? A. Yes, sir. Q. Were you willing to do that? A. Yes. Q. Did he tell you that was all it was worth? A. Yes; he said that's all it was worth. Q. Did you believe that? A. I don't know. He said that's all it was worth. Q. Well, have you ever sold it to anybody else besides him? A. No. Q. Has anybody else ever tried to buy it from you? A. Yes, sir. Q. Who? A. Walter Colbert. Q. Did you sell it to him? A. No, sir. Q. When was it this man Criner tried to buy it from you—how long ago? A. It was in 1908 I believe. Q. Since your mother died? A. Yes, sir. Q. That was last year? A. Yes, sir. Q. Did you sign a deed to Walter Colbert? A. No, sir. Q. Are you sure that you didn't? A. I don't know. Q. Have you ever signed any paper for Mr. Colbert? A. Yes, sir. Q. Do you know what it was? A. I don't know. You all got me puzzled now. Q. You may just tell the court what the transaction was you had with Mr. Colbert. Do you understand that question? You can tell the court what the trade was between you and Mr. Colbert, if there was any. A. I can't answer that. Q. You mean that you don't know? A. No. Q. You don't know? A. I don't know. Q. Did you sign any papers for him? Do you know whether you signed any papers for him? A. Yes; I believe I did sign papers. Q. But you don't know what it was—did he tell you anything about this land out here that used to belong to your mother? A. Yes, sir. Q. What did he say about it? A. He said he wanted to buy it. Q. How much did he say he would give you for it? A. Ten hundred and forty dollars. Q. Was that to you for your share or to you and Stella both? A. For my share. Q. Did he pay you any money? A. No, sir. Q. Has he ever paid you any money on it? A. No; he just give me $25. Q. And you signed a paper for him? A. Yes."

Stella Farve was interrogated, and her testimony was as follows:

"Q. Can you read? A. No, sir. Q. Can you write? A. No, sir. Q. Did you ever go to school? A. No, sir. Q. Do you know how to figure? A. No, sir. Q. What was your mother's name? A. Melvina Jackson. Q. And she died sometime in March last year? A. I can't tell you exactly how long it has been. Q. Do you know when she died? A. Yes. Q. Where did she die? A. Died on Hickory, about ten miles from Ardmore. Q. Did she have an allotment when she died? A. Yes. Q. Do you know where it is? A. Close to Ardmore, about six miles. Q. What direction; do you know what direction it is from Ardmore? A. No. Q. Have you ever seen it? A. No. Q. Have you ever been on it? A. No. Q. Do you know what kind of land it is? A. No, sir. Q. Do you know what's on it? A. No, sir. Q. Do you know what it is worth? A. No; I don't know what it is worth. Q. Your mother had only two children—you and your sister? A. Yes, sir. Q. You and your sister claim that land now? A. Yes, sir. Q. Why haven't you ever been on the land and investigated to see what it was worth? A. We couldn't live on the land because it don't have any house on it. Q. You have an allotment of your own, haven't you? A. No; I haven't got any. I am not on the roll. Q. Why, didn't you come here in time? A. Yes; I come here in time, but I was mixed breed. Q. Is your sister, Marcelene, enrolled? A. Yes; she's on the roll. She's a full-blood. Q. You are only half-sisters then? A. Yes, sir. Q. Have you ever tried to sell that land that your mother used to own, to anybody? A. Yes; I did. Q. To whom? A. Walter Colbert. Q. How much was he to give you for it? A. I don't know. Q. Did you ever try to sell it to anybody else, or did anybody else ever try to buy it from you? A. No. Q. Didn't Mr. Criner try to buy it? A. Yes; he's the one that tried to buy it first. Q. Did you ever sign a deed? A. Yes; and he give it to us back. Q. How much was he to give you for it? A. I don't know. He promised me first—said he would give me $300. Q. Were you willing to take that for it? A. Yes, sir; I was. Q. Did you sign a deed to him for it? A. Yes. Q. Do you know how much Walter Colbert agreed to give you for it? A. No. Q. You don't know how much. Did you sign any papers for Walter Colbert? Did you ever sign any papers or make your mark to any papers for Walter Colbert? A. No; not yet. Q. Have you got any agreement with him about signing any papers for him? A. Yes; I will sign them if they will let me sign them. It got all

tangled up. Q. How much was he to give you for it? A. About a thousand dollars I reckon. Q. Were you willing to take that for it? A. Yes; I was. Q. Did Mr. Criner tell you that $300 he was going to give you was all the land was worth? A. Yes. Q. Did you believe that? A. I didn't exactly believe it. I didn't have nothing, didn't have no money. That's the reason I took it. Q. You thought it was worth more than that? A. Yes. Q. Did he say it was worth that much? A. Yes. Q. Did he say that was all it was worth? A. Yes. Q. Do you believe that's all it is worth? A. I guess better take a thousand dollars; not get nothing now. * * * Q. You say your husband is dead? A. Yes. Q. With whom do you live now? A. With my sister. Q. Did you ever have any money in the bank? A. No. Q. Did you ever own any land? A. No, sir. Q. Have you ever owned any property of any kind yourself? A. No, sir. Q. Do you know what asphalt is? A. No, sir. Q. Did you ever see any? A. No. Q. Do you know what asphalt is worth? A. No. Q. Do you know what land is worth that's got asphalt on it? A. No. Q. Do you remember when your mother filed on this land at the land office? A. No, sir. Q. You didn't go with her? A. No, sir. Q. Were you living here then? A. Yes, I was. Q. Can you figure? A. No, sir. Q. Do you know how many five dollar bills it takes to make a hundred? A. Yes. Q. How many? A. I ain't going to tell you, though. Q. Tell the court. You aren't telling me. The court: Answer the question. A. I ain't going tell. The court: Well, you must answer. Tell him how many. A. Don't believe I could tell you. Q. Who brought you down here today? A. Myself. Q. Did you pay your expenses? A. Yes, sir. Q. How many deeds you say you signed to your mother's land? A. Signed for George Criner, that's all. Q. Did you sign one to W. B. Frame? A. I don't know. Q. Did you ever have any deal with him about the land? A. Don't know. Q. Did he ever pay you any money in connection with the land? A. No; George Criner did, but not him. Q. You never had any money in the bank? A. No, sir. Q. Do you know what a check is? A. Yes, sir. Q. Can you write one? A. How can I write one when I said I don't know how to write? Q. Can you read? A. No. Q. Did you ever go to school? A. No, sir."

David Shelby, who testified that he held the position under the United States government of district agent, testified that the land contained asphalt, and in his judgment was worth

Ex parte Logan.

$40,000, and that he had refused to recommend a deed for $10,000 for Marcelene's share.

From the foregoing and other testimony contained in the record we are convinced that these parties were mentally incompetent and incapable of protecting themselves in their estate, and that, by reason thereof, they are not only likely, but absolutely certain, to be deceived and imposed upon by artful and designing persons, and the jurisdiction and authority is vested in the county court to appoint a guardian or guardians to protect them.

Accordingly, the judgment of the district court is reversed, and the cause remanded, with instructions to proceed in accordance with this opinion.

TURNER, C. J., and HAYES and KANE, JJ., concur; WILLIAMS, J., absent, and not participating.