FISH v. DEAVER.

In re FISH'S GUARDIANSHIP.

No. 9472—Opinion Filed Nov. 19, 1918.

(176 Pac. 251.)

(Syllabus.)

### 1. Insane Persons—Insanity—"Mentally Incompetent" — "Incompetent" — "Incapable."

The descriptive words "mentally incompetent," "incompetent," and "incapable," as used in sections 6538 and 6539, Rev. Laws 1910, mean any person who, though not insane is, by reason of old age, disease, weakness of mind, or from any other cause, unable or incapable, unassisted, of properly, taking care of himself or managing his property, and by reason thereof would be likely to be deceived or imposed upon by artful or designing persons.

### 2. Same.

Mental incompetency or incapacity is established when there is found to exist an essential privation of the reasoning faculties, or where a person is incapable of understanding and acting with discretion in the ordinary affairs of life.

### 3. Same—Appointment of Guardian.

Where it is not shown that such mental incompetency or incapacity exists (as in the case at bar), it is reversible error for the county court to appoint a guardian of the estate of an adult person.

Error from District Court, Ottawa County; Preston S. Davis, Judge.

From an order of the district court affirming the judgment of the county court of Ottawa county declaring Joseph P. Fish an incompetent, and appointing Ira C. Deaver guardian of his person and estate, Joseph P. Fish brings error. Reversed and remanded with directions.

J. W. Swartz and A. Scott Thompson, for plaintiff in error.

E. C. Fitzgerald, for defendant in error.

SHARP, C. J. The principal question presented for our consideration is the sufficiency of the evidence to sustain the judgment of the trial court declaring Joseph P. Fish to

be an incompetent person, and in appointing a guardian of his person and estate. The record of the proceedings had in the trial court is voluminous, and it would serve no useful purpose to set out at length even the substance of the testimony of the many witnesses. Briefly, the proceedings to declare Fish an incompetent were had on the petition of Ira C. Deaver, superintendent of the Quapaw Indian agency at Wyandotte. At the trial Deaver, E. C. Fitzgerald, United States probate attorney, and J. P. McNaughton testified on behalf of the petitioner, while 11 witnesses gave testimony as to the competency of Fish to manage his property. It appears that Joseph's father, Leander J. Fish, though a Shawnee Indian by blood, because of his adoption as a Quapaw was enrolled as a Quapaw citizen and allotted land in the Quapaw Indian reservation. His son Joseph, though of Indian blood, was not enrolled by the government either as a Shawnee or a Quapaw Indian. Leander J. Fish died February 21, 1914, and his allotment, because of the discovery of lead and zinc ore thereon, has since his death become very valuable. During his lifetime Leander J. Fish executed to one W. M. Smith a mineral lease on allotment which provided for the payment of a 5 per cent. royalty. The validity of the lease or at least of a portion thereof, being in controversy, Joseph P. Fish and wife on February 7, 1916, executed to Smith a new lease for a term of seven years, or for the unexpired period covered by the original lease, and which also provided for the payment of a 5 per cent. royalty. Subsequent to the making of the original lease Smith had subleased a part of the demised premises to the Church-Mabon Mining Company, who had expended in development work thereon a sum exceeding $50,000. The lands sublet to the mining company were the lands included in the lease made by Joseph after he had attained his majority. When the first lease was made the Fish allotment was, in mining vernacular, "wild-cat" territory. Due to subsequent development work, large deposits of rich lead and zinc ore were discovered on the lands included in the 40-acre tract covered by the new lease and at the time of the trial in the district court the value of this lease (known as the Montreal Mines) was said to be not less than $1,000,000. Leander J. Fish, it appears, was an improvident person, and at the time of his death was heavily in debt and his estate more or less incumbered. Smith had on numerous occasions given Leander J. Fish financial aid, and after his death assisted Joseph in a financial way. As a result of these benefactions and the fact that Smith, through his sublessee, had caused large sums of money to be expended in the exploration and development of the lands for minerals, Joseph, to remove any existing doubt as to the validity of the lease executed by his father, gave the lease of February 7, 1916. In the situation of the property on the latter date, it commanded better than a 5 per cent. royalty; in fact, Joseph had refused to make the witness McNaughton a lease providing for a 10 per cent royalty and a cash bonus of $1,000. It is due principally to the fact that young Fish respected the lease made by his father under the circumstance detailed that it is claimed he is an incompetent person and mentally unfitted to manage his property.

We have examined the evidence in the record with care, and, notwithstanding the judgment of the trial court, have reached the conclusion that Joseph P. Fish, instead of being mentally incompetent to manage his property, is a young man far above the average in intellect, travel, experience, and business acumen. It appears that Joseph received a common-school education at Wyandotte and Washington, D. C., where, with his father, he spent a large part of his boyhood days. While in school he sold papers after school hours, drove a delivery wagon, worked in a department store, ran a shooting gallery, and was employed in the shipping department of the Adams Express Company, and afterwards made first assistant shipping clerk. For about six months during the years 1916 and 1917 he was in the employ of the company operating the Montreal mines at a salary of $75 a month. Two months thereafter his salary was increased to $85 per month. His position was that of stock and weigh clerk, and his duties were to receive all inbound freight and supplies of the company and check the tickets and invoices and distribute the supplies to the miners as called for. He also had charge of weighing all ore, coal, and other material used in the mines. All settlements for supplies and ore depended upon the correctness of the checks and weights turned in by him to the bookkeeper. His accounts, as testified to by accountant and bookkeeper Couch, were always founds to be correct. C. F. Dyke, manager of the Montreal Mines testified that during the six months Fish was in the company's employ he handled supplies worth between $60,000 and $75,000 in value, and that the ore sold from the mines during

his employment, based on his weights, was of the value of more than $200,000. The witness further testified that during Fish's employment with the company in the mines there had been no discrepancies and no complaint whatever of his work, and that he left the employment of the company voluntarily for the purpose of platting a town site on a portion of the lands inherited from his father. This business it appears he carried on intelligently, successfully, and profitably. It seems, too, that both the witness Deaver and Fitzgerald were consulted by young Fish in respect to his town-site plans. Being asked about Fish's plan of laying out the town site, the witness Deaver testified.

"Q. Isn't it a fact that under permission of the judge of the county court of this county he has laid out and has managed a town site up there on his land himself? A. Myself and the probate attorney gave him authority to collect rentals up there on that land, etc.

"Q. In fact, instead of you and the probate attorney giving him permission the county judge gave him permission? A. We were all consulted in the matter.

"Q. But the judge finally gave him permission, didn't he? A. The probate attorney and myself talked with Fish and discussed this matter and put it up to the county judge and recommended it.

"Q. Now, since he laid out this town site he has been leasing the lands and managing the property? A. Yes, sir; we thought he was capable possibly of doing that.

"Q. And he has been collecting the rents? A. I suppose so.

"Q. Do you know how many lots he has there? A. About the time the railroad company was going through there I think something like 300."

Testimony of witness Fitzgerald respecting the town site is very much the same as that of the witness Deaver. Furthermore, it appears that Fish got up his own rental contracts, and, in short, had entire charge of managing the leasing of lots in the town site. Though introduced as a witness against Fish, J. P. McNaughton testified that Joseph had supported his father while in Washington, and, without objection, testified that he had been informed by a Mr. Sykes of Sykes & Co. of Washington, his employer, that "he was the most apt boy he ever had." Witnesses testifying as to young Fish's competency, in addition to the witnesses Couch and Dyke, were James S. Mabon. of the Church-Mabon Mining Company; Harve B. McAbee, who had known Joseph from child-

hood; Dr. J. T. Horton, his family physician; J. R. Hall, president of the Commerce Commercial Club and manager of Hood & Son Impl. Co.; S. E. Lee, implement dealer; Carl H. Plumb, mining engineer; B. H. Wilson, of the Welch Mining Company: and Dr. W. L. McWilliams, president of the First National Bank of Miami, who had known Joseph since he was a child. The testimony of all these witnesses was to the effect that Joseph was a young man above the average in intelligence, experience, and business ability. All who were asked commended his course in making of new lease for the unexpired term and for the same royalty as provided for in the lease made by his father. Another instance deserving of little consideration, involved the purchase of 60 acres of rough unimproved land in Mayes county. This it was claimed was an evidence of weakness of mind on the part of Fish, in that it showed a purpose to leave his rich possessions in the mining district and move some distance away and engage in the business of running a chicken ranch. Trifling as the incident is, it does not even appear that Fish bought the land offered him or that he moved away. Again it is claimed that the lessee, Smith, seemed to exercise a sinister influence over young Fish. Of what this influence consists is not clear. We are unable from the record to ascribe to Smith any evil influence, but, on the other hand, a desire to assist Fish in resisting the appointment of a guardian of his estate on account of alleged mental incompetency. It may be granted that on account of his lease Smith was vitally interested in the result of the proceedings. But that fact alone furnished no grounds for the charge that Fish was under Smith's influence in such way or to such an extent as would render him incapable of taking care of himself and managing his property.

Whether the original lease, under which large sums of money had been expended, was valid or not, we do not undertake to say, as the question is not directly or properly before us. If, in securing the new lease, Smith overreached young Fish, or practiced a fraud upon him, or if the transaction grounds exist for setting aside the lease, the same can be presented in a proper suit brought for that purpose. But whether the making of the lease be a judicious one or not, all the facts considered, it affords no ground for depriving this young man of the management and control of his estate, however honorable may be the motives of those who prompted the institution of the pro-

ceedings. Section 6538, Rev. Laws, provides that when it is represented to the county court, upon verified petition of any relative or friend, that any person is insane or from any cause mentally incompetent to manage his property, the judge must cause notice to be given to the supposed insane or incompetent person of the time and place of hearing the case; and by section 6539 it is provided that "if, after a full hearing and examination upon such petition, it appears to the judge of the county court that the person in question is incapable of taking care of himself and managing his property," a guardian of his person and estate must be appointed. Looking to the meaning of the words "incompetent," "mentally incompetent," and "incapable," as used in the statute, we said in Shelby et al. v. Farve et al., 33 Okla. 651, 126 Pac. 764:

"Any person, who, though not insane, is, by mind, or from any other cause, unable, unassisted, to properly manage and take care of himself or his property, and by reason thereof would be likely to be deceived or imposed upon by artful or designing persons."

The rule, while adopted by our court from a California statute, is, in effect, the same as that generally adopted in jurisdictions having statutes similar to our own. Generally it may be said that if it clearly appears (McCammon v. Cunningham, 108 Ind. 545, 9 N. E. 455) that the alleged incompetent, due to mental unsoundness, is incapable of conducting his affairs and managing his property to such an extent that, unless a court intervenes and appoints a guardian, he would become the prey of dishonest and designing persons, and his estate dissipated, the duty of the court to appoint a guardian is clear. Woerner, Law of Guardianship. § 113; Emerick v. Emerick, 83 Iowa, 411. 49 N. W. 1017, 13 L. R. A. 757; Gray v. Obear, 59 Ga. 675; In re Streiff, 119 Wis. 566, 97 N. W. 189, 100 Am. St. Rep. 903; Re Barker, 2 Johns, Ch. (N. Y.) 232; Com. v. Schneider, 59 Pa. 328; In re Lindsley, 43 N. J. Eq. 9, 10 Atl. 549; Id., 44 N. J. Eq. 564, 15 Atl. 1, 6 Am. St. Rep. 913; Shapter v. Pillar. 28 Colo. 209, 63 Pac. 302. In such case mental incompetency or incapacity is established when there is found to exist an essential privation of the reasoning faculties, or where a person is incapable of understanding and acting with discretion in the ordinary affairs of life. Testimony in the record falls far short of establishing a state of facts bringing Joseph P. Fish within this category. Laying aside any question of a moral obligation resting upon him to make a lease that

would place Smith's title beyond controversy, and considering his act as an injudicious one, it would not even tend to establish his incapacity to manage his property. It would at most be but an unwise business transaction, such as is made every day by the shrewdest of men in the business world. Citizens are not to be thus lightly deprived of their constitutional rights to "the enjoyment of the gains of their own industry." Section 2, art. 2, Constitution.

The judgment of the trial court is reversed, and the cause remanded, with directions to order the proceedings dismissed.

All the Justices concurring, except TURNER and BRETT, JJ., absent.