[Civ. No. 2962. First Appellate District, Division One.—October 27, 1919.]

In the Matter of the Estate of CLEMENCE MAUVAIS, Deceased. EDITH MAUVAIS TEVIS et al., Respondents, v. JULIETTE M. FERGUSON, Individually and as Executrix, etc., Appellants.

[1] ESTATES OF DECEASED PERSONS—REVOCATION OF PROBATE OF WILL—PERSONS INTERESTED—SUFFICIENCY OF PETITION.—A petition for the revocation of the probate of a will which alleges that the petitioners are the son and daughter of the deceased and that they, with two other persons named, constitute and are the sole heirs at law of said deceased, sufficiently shows that the petitioners are persons "interested" within the meaning of section 1327 of the Code of Civil Procedure.

[2] ID.—PETITIONERS NOT PERSONS INTERESTED—RIGHT TO RAISE ISSUE BY ANSWER.—If for any reason not apparent upon the face of a petition for the revocation of the probate of a will the petitioners are not persons "interested" within the meaning of section 1327 of the Code of Civil Procedure, notwithstanding their status as heirs at law of the deceased, it is proper to challenge the right of the petitioners to wage the contest by answer creating an issue as to the necessary interest of the petitioners.

[3] ID.—UNDUE INFLUENCE—INTENTION OF TESTATORS—STATEMENTS NOT EVIDENCE.—In a will contest on the ground of undue influence, declarations of the testatrix prior to and subsequent to the date of the will in issue that she intended treating all her children alike in the final disposition of her property are not of themselves sufficient to establish undue influence.

[4] ID.—OPPORTUNITY TO INFLUENCE TESTATRIX—EVIDENCE OF UNDUE INFLUENCE.—Mere proof of opportunity to influence a testatrix's

3. Admissibility of declarations of testator not made at time of execution of will, on question of undue influence, notes, Ann. Cas. 1917D, 717; 3 L. R. A. (N. S.) 749.

mind, even when coupled with an interest or motive so to do, will not sustain a finding of undue influence, in the absence of testimony showing that there was pressure operating directly on the testamentary act.

[5] ID.—PROOF OF GENERAL INFLUENCE.—A case of undue influence is not made out by proof of a general influence over the affairs of the testatrix without proof that such influence was brought to bear upon the testamentary act.

[6] ID.—PROOF OF UNDUE INFLUENCE BY INDIRECT EVIDENCE.—While the exercise of undue influence may be shown by indirect evidence, such evidence must do more than raise a suspicion; it must amount to proof, and such evidence has the force of proof only when circumstances are proven which are inconsistent with the claim that the will was the spontaneous act of the alleged testator. In order to set aside a will for undue influence, there must be substantial proof of a pressure which overpowered the volition of the testator at the time the will was made.

[7] ID.—CASE AT BAR—INSUFFICIENT PROOF OF UNDUE INFLUENCE.— In this proceeding for the revocation of the probate of a will the legal inferences, proper to be drawn from the circumstantial evidence relied upon by the contestants, amounted in weight and value to no more than to create the suspicion or surmise that the will in probate was procured through the undue influence of the proponent; and the proof relied upon was insufficient as a matter of law to upset the will in contest.

APPEAL from a judgment of the Superior Court of Santa Clara County revoking probate of will. P. F. Gosbey, Judge. Reversed.

The facts are stated in the opinion of the court.

Delphin M. Delmas and Leib & Leib for Appellants.

Oliver Ellsworth and James P. Sex for Respondents.

Harry W. McNutt, *Amicus Curiae.*

BARDIN, J., *pro tem.*—This is an appeal from an order revoking the probate of ·the alleged will of Clemence Mauvais, deceased, and the accompanying judgment declaring said will to be null and void.

Two claims are urged in behalf of the appeal: (1) That the court was without jurisdiction to hear the petition for the revocation of probate of said will; and (2) that the evidence adduced below is insufficient to justify the findings

of the jury. These claims will be disposed of in the order stated.

Clemence Mauvais died on August 8, 1916, leaving as her sole heirs at law her four children, all of mature age, named Juliette Mauvais Ferguson, the appellant and proponent of the will, Romeo Mauvais and Edith Mauvais Tevis, the respondents and contestants, and Ernest Mauvais. Mrs. Mauvais left a written instrument dated June 16, 1907, purporting to be her holographic will, by the terms of which she left all her property to her daughter Juliette. On September 22, 1916, the order was made admitting the purported will to probate and appointing Juliette Mauvais Ferguson the executrix thereof, letters testamentary being thereupon issued to her.

Within one year after said order was made the contestants filed their petition containing allegations against the validity of said will and praying that the probate thereof be revoked. A demurrer was interposed against the petition based upon general and special grounds. The demurrer was ordered sustained on September 21, 1917, leave being granted to file an amended petition within ten days. An amended petition was filed September 29, 1917, seven days after the expiration of one year from the date of the order admitting the will in question to probate. The amended petition concededly contains all the essential allegations required by the statute. The appellant has ever since the filing of the amended petition asserted by appropriate pleadings and procedures the claim that the court was without jurisdiction to entertain the proceeding in contest of said will, and that the contestants were barred from procuring the relief sought, for the reason that the statute of limitations applicable to the subject matter in hand (Code Civ. Proc., sec. 1327) precluded the filing of a petition in contest of the will, after the expiration of the time limited by the statute, except it be in mere amplification of a petition filed within the prescribed time; and, that since the original petition failed to show that the contestants were persons "interested" within the meaning of the section of the code stated above, such defect could not be cured by amendment made after the expiration of the statutory period, and that, therefore, the bar of the statute must prevail.

The first petition contains the following allegation: "That your petitioners are son and daughter of said deceased, and that together with said Juliette Ferguson, a daughter, and Ernest Mauvais, a son, constitute and are the sole heirs at law of said deceased."

To this allegation there was added, in the amended petition, the following: "That said decedent in said alleged will leaves nothing whatsoever to any of her children except said daughter, Juliette, to whom she bequeaths and devises all her property and estate."

[1] We are of the opinion that the original petition as a pleading showed that the petitioners were persons "interested," within the meaning of the section of the code referred to. The contention of the appellant to the effect that the court was without jurisdiction to hear the contest or to grant the relief prayed for, is neither in accord with the views of the supreme court of this state already expressed upon this subject (*Estate of Zollikofer,* 167 Cal. 196, [138 Pac. 995]; *Estate of Land,* 166 Cal. 538, [137 Pac. 246]; *Estate of Benton,* 131 Cal. 472, [63 Pac. 775]), nor with that of other jurisdictions where similar statutory requirements have been prescribed. (40 Cyc. 1242; case note, 130 Am. St. Rep. 189; case note, L. R. A. 1918A, 448–452.)

[2] If for any reason not apparent upon the face of the petition the petitioners were not in fact "interested" within the meaning of the statute notwithstanding their status as heirs at law of the decedent, it would have been proper to challenge the right of the petitioners to wage the contest of decedent's will by answer creating an issue as to the necessary interest of the petitioners, and as was done in *Estate of Wickersham,* 153 Cal. 603, [96 Pac. 311], and in *Estate of Edelman,* 148 Cal. 233, [113 Am. St. Rep. 231, 82 Pac. 962].

We pass now to the consideration of the second point urged in behalf of this appeal.

The contestants' case is founded upon the theory that the proponent of the will in contest and the sole beneficiary therein named procured such will to be made against the will and wish of the testatrix by the exercise of undue influence, and that, therefore, it must follow that the paper purporting to be a will is invalid and void. The allegations

of the petition having relation to the charge of the exercise of undue influence are substantially as follows: That for some months prior to the execution of the alleged will the health of the decedent was seriously impaired, thus producing a weakened condition of the physical and mental powers of said decedent, which condition existed at the time of the exercise of the testamentary act in question and rendered her easily susceptible to undue and unreasonable influences; that decedent was a woman of strong and easily excited prejudices; that at the time of the execution of said alleged will the proponent made her home with the decedent, was in constant attendance upon her, and assumed charge of her affairs, and that by reason of decedent's said impaired mental and physical condition, and of proponent's close association with her, that decedent's will and mind became controlled and directed by proponent, who by false statements and prejudices embittered the mind of the decedent against her other children, and that under such circumstances and while under the domination and control of proponent and against her own will and wish, executed the purported will.

All these allegations of the petition were controverted by the answer. The findings of the jury were in favor of the contestants.

The will in contest was the second holographic will made by Mrs. Mauvais following the death of her husband. The record is silent as to the immediate circumstances attending its execution. The preparation of the first will bears close and significant relationship to the execution of the second one. Both wills were practically the same, the difference consisting only in the omission from the second will of the bequest of a watch to Romeo Mauvais and some articles of jewelry to Edith Tevis.

With reference to the preparation and execution of the first will, E. M. Rea, of the Santa Clara County bar, testified that for a number of years he had been the personal attorney of Romeo Mauvais, Sr., the pre-deceased spouse of Clemence Mauvais, and that upon the death of Mr. Mauvais, he became the attorney of Mrs. Mauvais, serving as legal adviser to her in matters personal to her own affairs, and also in her representative capacity as executrix of her deceased husband's last will. Mr. Rea testified that shortly following the death of Mr. Mauvais, which occurred

in the earthquake of 1906, Mrs. Mauvais requested him to call at the family home, which he did. Mrs. Mauvais stated to Mr. Rea on that occasion that she desired to make her will. At that time Mr. Mauvais' will was still in the family home. It was suggested by the attorney that, in view of Mrs. Mauvais' desire to be secretive about the execution of her will, she make a holographic will as her husband had done, which was agreeable to Mrs. Mauvais. She gave detailed instructions as to the disposition of her property, and her will was prepared with the assistance of Mr. Rea, who closely followed the phraseology of the holographic will of Mr. Mauvais as to form. The testamentary desires of Mrs. Mauvais were explicitly carried out. In explanation of the reason why she made her daughter Juliette practically the sole beneficiary under her first will (although she was accustomed to speak in loving terms of all her children), she stated to Mr. Rea, according to his testimony, that Edith "had everything she wanted and would never want for anything," and that "Ernest would get no good out of the money" for certain expressed reasons, "and that as long as Juliette had the money she was sure that Ernest could always come around and get some money when he needed it"; and that Juliette "had married poorly and that her husband was not in a position to do for her as he wanted to." Practically the whole of one afternoon was consumed in the preparation and execution of the will referred to. No one else was present at any time. Juliette Ferguson was not at the house at the time, and, so Mr. Rea testified, had not been for several days at that time. The will, as executed, was left with Mrs. Mauvais to be placed in a secret receptacle in the Mauvais home.

Referring to the holographic will in contest, dated June 16, 1907, Mr. Rea testified that "Mrs. Mauvais brought this present will up to my office; I looked it over in court yesterday. She showed it to me. So far as my memory goes it was that exact paper. She might have copied it again; I can't say; but it was the same as that will. She told me she had rewritten it and left out the provisions of the watch to Romeo and the jewelry to Mrs. Tevis, and she asked me to look it over and see if it was all right, which I did."

In 1908 the relation of attorney and client between Mr. Rea and Mrs. Mauvais ceased. She then retained Hiram D.

Tuttle, formerly a judge of the superior court of Santa Clara County, as her counsel. Judge Tuttle stated in his testimony that he was legal adviser to Mrs. Mauvais for several years, and that his impression was that she had shown him the will in contest and had consulted him as to its form.

The testimony of Mr. Rea and of Judge Tuttle touching the matters above referred to stands unimpeached and uncontradicted in the record.

There is no evidence directly showing that Juliette Ferguson had anything at all to do with the preparation or execution of either of the wills referred to or knew or suspected either was being made. She positively swore that she did not know of their existence until after they were made, and there is no proof to the contrary. She stated that she did not learn of the preparation of the first will until after her mother's death.

The evidence does not disclose that the decedent suffered any serious impairment of health until after the execution of the will in probate; in fact, not until some months following its execution. There is not even slight evidence in the record showing that at the time of the exercise of either of the testamentary acts referred to in the evidence, either her mental or physical powers were in a debilitated or weakened condition. In fact, the evidence shows that mentally she was a woman of superior will power and possessed a firm and determined mind, not only at the time of the execution of the will in probate, but for years afterward, and until her last illness.

Mr. Rea testified that at the time she made the first will she was in perfect health. Quoting from his testimony relative to the quality of her mind: "During the long acquaintance I had with her I had opportunities to judge of her intelligence. . . . She was very superior to either the ordinary man or woman in business. . . . Mrs. Mauvais had a very technical mind and she got to the bottom of things. When Mrs. Mauvais consulted me upon a law point, I have to use a vulgar expression, 'she was from Missouri and I had to show her.' She would take the statute and diagnose it herself and go over it and if my opinion didn't suit her, she would go to some other lawyer and come back and talk it over with me and before she got through she

would get right to the bottom of things. In matters of business in buying or selling or loaning money she was very thorough. Mrs. Mauvais had a very good idea of the value of real estate and of moral security of the people and she went into those things very thoroughly, a hundred times better than I could myself on a business proposition. In regard to her will, I would say that Mrs. Mauvais always made up her own mind. I dealt with her for years. Mrs. Mauvais was a person who made up her mind from personal investigation. She was exceedingly firm and determined. She was never a woman of vacillating purpose of will on anything that I ever saw in all the many years of acquaintance, both socially and in business.''

Judge Tuttle testified that he was the legal adviser of Mrs. Mauvais for several years following 1908, and that ''from her first appearance in my office I was impressed with her understanding, thorough understanding of her business. She was a capable woman; she was above the average in mentality. She understood her affairs, she understood things when they were explained to her and insisted upon explanations frequently in matters that other clients would not be apt to insist upon, and matters would have to be explained to her fully frequently before she would adopt the advice which I was disposed to give her. In a general way she was a very competent woman. I do not think anybody could persuade Mrs. Mauvais to do what she did not think was right. She was a high-minded woman with correct notions of right and wrong, duty and the violation of duty.''

Stated in brief form, Dr. Filipello testified that he had been acquainted with Mrs. Mauvais for twenty years, and had been her regular family physician since about 1902. That he saw her socially quite often; ''I always found that she was in perfect, clear, sound intelligence, very bright. She was firm in her decisions; very affectionate to her children, and she attended to her business regularly. . . . She was not a woman readily influenced by the opinion or the advice of others, even her physician.'' She often spoke about her business affairs.

Dr. Beattie testified that he had called upon Mrs. Mauvais professionally at the beginning of her last illness and attended her for some months; that ''she was a very strong-

minded woman much to my surprise on many occasions. Absolutely self-reliant. She was quick and alert. I formed the opinion that she was a high-minded, high-principled woman and a woman of refined education."

Dr. J. U. Hall testified that he had attended Mrs. Mauvais professionally as a consultant, from time to time, for a period of eight years, beginning in January, 1908, and had opportunities to form, and did form, the opinion that she had, for a woman of her age, a keen, forceful, independent mind.

A number of letters written by the decedent to her children, for the most part subsequent to the execution of the will in probate, were offered in evidence. They show a degree of refinement and intelligence superior perhaps to that possessed by the average person. She continually addressed and spoke of all her children in terms of affectionate endearment and disclosed no degree of partiality nor suggestion of prejudice for or against any of them.

The relations existing between Mrs. Ferguson and her brothers and sister, during the years following the death of their father, Romeo Mauvais, Sr., were strained and fraught with misunderstandings and often with great bitterness of feeling. But it is not at all certain that these family disturbances and quarrels, and any false tales the daughter Juliette may have carried to her mother, had any perceptible or enduring influence upon the mind of the decedent. For instance, in a letter written by Mrs. Mauvais to her son Romeo in 1907 or 1908, having reference to previous difficulties between Juliette and Romeo, she wrote: "You know, Romeo, dear, I can't take any part in any of my children's misunderstandings." Much less may it be said that there is any substantial evidence in the record to which our attention has been directed which directly or indirectly establishes it as a fact that such family difficulties, or any statements made by the daughter Juliette to her mother, growing out of them, unduly influenced or unfairly affected the mind of the mother with reference to the composition and execution of the will in probate.

[3] Testimony was adduced on behalf of the contestant to the effect that the decedent had stated at times, both prior to and subsequent to the date of the will in issue, that

she intended treating all her children alike in the final disposition of her property. Such statements, however, are not of themselves sufficient to establish undue influence. (*In re Calkins,* 112 Cal. 296, [44 Pac. 577]; *Estate of Kilborn,* 162 Cal. 4, [120 Pac. 762]; *Estate of Lavinburg,* 161 Cal. 536, [119 Pac. 915].)

[4] The favored daughter had ample opportunity, so far as time and environment were concerned, to influence her mother's mind, but, as said in the *Estate of Kilborn,* 162 Cal. 4, [120 Pac. 762], "mere proof of opportunity to influence a testator's mind, even when coupled with an interest or motive so to do, will not sustain a finding of undue influence, in the absence of testimony showing that there was pressure operating directly on the testamentary act."

[5] It may be assumed, as claimed by the contestants, that the beneficiary of the will in question exerted a general influence over the affairs of the testatrix; yet without proof that such influence was brought to bear upon the testamentary act, a case of undue influence is not made out. (*Estate of Morcel,* 162 Cal. 188, [121 Pac. 733].)

[6] The contestants offered no evidence directly showing the exercise of undue influence by the daughter Juliette with respect to the testamentary act itself in question. While it is of course true that the exercise of undue influence may be shown by indirect evidence, such evidence must "do more than raise a suspicion. It must amount to proof, and such evidence has the force of proof only when circumstances are proven which are inconsistent with the claim that the will was the spontaneous act of the alleged testator." (*Estate of Kilborn,* 162 Cal. 4, [120 Pac. 762]; *McDevitt's Estate,* 95 Cal. 17, [30 Pac. 101]; *Estate of Calkins,* 112 Cal. 296, [44 Pac. 577]; *Estate of Morcel,* 162 Cal. 188, [121 Pac. 733].)

"In order to set aside a will for undue influence, there must be substantial proof of a pressure which overpowered the volition of the testator at the time the will was made." (*In re Langford,* 108 Cal. 608, [41 Pac. 701].)

It seems very highly improbable that a woman of Mrs. Mauvais' mental capacity, temperament, and business experience, knowing how to write her will (having in fact already written two), accustomed to advise freely with lawyers, self-reliant and of decisive mind, and situated

as she was, would have permitted any paper which she had been forced to execute against her desires to stand for years without revocation.

[7] It appears to us that the legal inferences, proper to be drawn from the circumstantial evidence relied upon by the contestants, amount in weight and value to no more than to create the suspicion or surmise that the will in probate was procured through the undue influence of the proponent. We believe that the proof relied upon is insufficient as a matter of law to upset the will in contest.

The order and judgment appealed from are reversed and the cause remanded for a new trial.

Richards, J., and Waste, P. J., concurred.