## In re SHIPMAN'S ESTATE.
## SHIPMAN et al. v. SHIPMAN et al.
No. 28451.   Nov. 22, 1938.

McGuire & McGuire, for plaintiffs in error.

Hugh J. Adams, for defendants in error.

DAVISON, J.   This case involves a controversy as to which of two wills executed by one Martin A. Shipman, deceased, should be admitted to probate. The wills were executed December 22, 1927, and December 3, 1935, respectively. The surviving heirs named in both wills are the testator's four adult children, namely: John W. Shipman, Jim D. Shipman, Birt H. Shipman, and Macey May Glock.

The testator owned an 80-acre farm in Logan county and a city block, described in one of the wills as his "homestead," in Guthrie, Okla. By the terms of the earlier will, this real estate, together with the testator's personal property, was bequeathed in equal shares to the four children, and Birt H. Shipman was designated executor of said estate. The later will named John W. Shipman executor, and bequeathed to him the city real estate and an undivided one-half interest in the farm and personal property. The other half interest in the farm and personal property was bequeathed to Jim D. Shipman, while the other two children were given only $1 each.

John Shipman petitioned the county court for probate of the will in which he was designated executor, and the other heirs filed objections thereto. Then Birt H. Shipman filed a petition for the admission to probate of the earlier will, in which he was named executor. The county court upheld the earlier will and in accordance with its provisions appointed Birt H. Shipman executor of the decedent's estate. Thereupon

John Shipman appealed to the district court. The district court reversed the decree of the county court and ordered the discharge of Birt H. Shipman as the executor, the admission to probate of the later will, and the appointment of John Shipman as executor of the estate. From said judgment, Birt H. Shipman, Jim D. Shipman, and Macey May Glock have brought the present appeal. The appellants and the appellee will hereinafter be designated as "contestants" and "proponent," respectively.

It is conceded that the will which the district court ordered admitted to probate is the last will and testament of the deceased, but the contestants maintain that it is invalid because it was executed while the testator was mentally incompetent and under the undue influence and duress of the proponent. In support of the first of these claims, they rely upon the county court's adjudication of the testator's incompetency and certain testimony concerning his mental and physical condition prior to his death. To support the charge of duress and undue influence they point to the undisputed fact that the proponent accompanied the testator to the office of the lawyer who drew up the will, and to conversations which the witnesses Mr. Huffman and Mrs. Powell testified that they had with the testator.

The record shows that on April 17, 1934, the contestant, Birt H. Shipman, filed in the county court a petition, joined in by the testator's wife and his other three children, seeking an adjudication of the testator's incompetency and the appointment of a guardian for him. In said petition it was alleged that the testator was almost totally blind, and that because of his physical and mental condition he was mentally incompetent to manage his property, to direct his personal and business affairs, or to properly care for his maintenance and livelihood. On April 24, 1934, after a hearing was had on the aforesaid petition, the testator was adjudged incompetent and Birt H. Shipman was appointed his guardian.

The evidence further discloses that on November 15, 1935, the proponent, John W. Shipman, filed a petition asking the county court to restore the testator's competency and to discharge his guardian. It was therein alleged that the incompetent was 84 years of age; that his mind was perfectly sound, and that he was mentally capable of transacting his own business, and competent to direct his personal affairs and care for his person and property. In said petition it was further alleged that the petition of Birt H. Shipman, whereby said petitioner had sought and obtained an adjudication of the testator's incompetency and his own appointment as the testator's guardian, was filed as a matter of convenience and because, due to his age, the testator had felt that it was to his interest to have one of his sons assist him in caring for his property. It was further alleged that said guardian had not proved satisfactory to the testator, and that the latter had made arrangements with the petitioner, who lived at his home, to assist him in taking care of his business when such assistance was desired, and that the guardianship was an unnecessary expense. At a hearing had upon this petition, the county court refused to restore the testator's competency, and on November 27, 1935, entered an order adjudging him "not at this time of sufficient sound mind to be capable of taking care of himself and his property." A few days later, the proponent accompanied the testator to the office of his attorney, where the will in question was drawn and executed.

More than 14 months later, on February 27, 1937, the testator died after having been in poor health and suffering from numerous physical ailments for ten or twelve years.

The evidence further shows that there were two houses on the testator's home place and that he lived in one of them while the proponent lived in the other. The proponent testified that he had taken care of his father during the last four years of the latter's life.

The record of Mr. Huffman's testimony discloses that his conversation with the testator occurred in the latter part of November, 1935. The only part of that testimony that refers directly to the issues involved is contained in the following excerpts from the record:

"Q. What did he tell you about making a will and his reason for making it? A. He told me that he guessed he would have to make a new will, that John had told him, had been after him—he says 'I couldn't cut Macey out, I could make a new will all except cutting Macey out,' but he said he had given John enough, the place at home, to take care of him. It seemed he wanted John to have the home place and the other divided up equal, the farm. And he said something about if he didn't change his will, he would have to change his boarding place. * * * Tell the court what he said about John. A. He mentioned John wanted him to cut the girl out of the will and make a new will and cut her out and he didn't want to do that."

In so far as it refers to the contestants' contentions, the record of Mrs. Powell's tes-

timony concerning her conversation with the testator in June or July, 1935, is as follows:

"Q. Did you have any conversation with him? A. Yes, sir. Q. Anything relating to a will? A. Yes, sir, he told me he was worried, said John had been trying to get him to change his will and he said he wasn't going to do it. Q. Did he say in what particular he wanted him to change it? A. No, sir. Q. What else did he say there? A. He said Macey and Birt had helped him a lot, but he said John moved out there and he didn't feel like John ought to be a hog and take it all. * * * Q. Did you understand from that conversation that John was insisting that he change his will and give him all the property? A. Yes, sir. Q. Did he say anything about what John wanted him to do when he changed his will? A. Yes, sir, he wanted him to leave it all to him and cut the other children out. Q. What did he say about that? A. He said Macey ought to have some because she lived on his homestead and looked after him and she still come in and did what she could. * * * Q. Did you observe his condition at that time? A. Well, he was very poorly then. Q. How was he in comparison with the preceding year? A. He couldn't get around so well. Q. Did you notice any change in his conversation and his mental ability? A. Yes, sir, I don't think he talked like he did. * * * A. I don't think he talked like he knew what he was saying. Q. What do you mean by that? A. He was bothered about something."

At the beginning of their argument, counsel for the contestants recognize the rule that the contestants in a will contest have the burden of overcoming the presumption of the testator's sanity (In re Blackfeather's Estate, 54 Okla. 1, 153 P. 839), and the further rule that a presumption of the testator's want of testamentary capacity does not arise from an adjudication of his incompetency (In re Nitey's Estate, 175 Okla. 389, 53 P.2d 215). However, they maintain that, notwithstanding such well-established principles, an adjudication of incompetency should be considered by the court in determining testamentary capacity. With this we heartily agree, but it is not shown that the county court's adjudication of the testator's incompetency was not taken into consideration by the district court. The incompetency proceedings were all before said court and a part of the record when its judgment was rendered. The contestants go further, however, and assert that, since the county court passed upon the question of the testator's competency only six days before the will in question was executed, its decision on that matter should be almost conclusive as to the testator's testamentary capacity when the will was exe-cuted. This might be true in the absence of other evidence of the testator's capacity, and it might be true of the present case, yet, being purely a relative assertion, it is not an unequivocal indictment of the judgment herein appealed from; nor, if true, does it furnish sufficient basis in itself for setting said judgment aside.

In the case of In re Nitey's Estate, supra, we held that if the maker of a will has the mental capacity to understand the nature and consequences of his acts at the time of the making of the will, he possesses testamentary capacity. The sixth syllabus of that opinion is as follows:

"The ability to transact business is not a true test of testamentary capacity; a person may not have sufficient mind or vigor of intellect to transact business generally and make contracts, yet possess testamentary capacity; and adjudication of incompetency to manage his estate and the appointment of a guardian by reason thereof, are, therefore, not inconsistent with testamentary capacity, and proponent of a will executed by a person so adjudged is not required to offer evidence showing a change in the mental condition of such person from that which obtained at the time of the adjudication and is not required to offer evidence of a restoration to capacity at the time of the execution of the will."

In addition to the above rule, we believe the following language in the body of that opinion is of special value in the decision of the present case upon the question raised:

"As to the contestant's second assumption, all adjudicated incompetent persons in Oklahoma are not persons of unsound mind. Section 1449, C. O. S. 1921, which is the statute under which Nitey was adjudicated to be an incompetent (Id. section 1445, O. S. 1931), recognizes two classes of persons for whom a guardian can be appointed, one, 'insane' persons, and the other, persons who from any cause are 'mentally incompetent to manage their property.' Shelby et al. v. Farve et al., 33 Okla. 651, 126 P. 764, 765.

"The word 'insane' lexically 'signifies delirious; deranged in mind, distracted; unsound in mind or intellect.' 32 C. J. 613. This is the class contemplated by the statute urged by contestants. viz., section 4983, C. O. S. 1921 (section 9404, O. S. 1931); by the specific wording of this statute. only persons 'of unsound mind' are included, and section 4975, C. O. S. 1921 (section 9396, O. S. 1931), which is a part of the same chapter, defines this class as follows: 'persons of unsound mind, within the meaning of this chapter, are idiots, lunatics and imbeciles.' The other class of incompetents, using the language of this court, embraces

any person, who. though not insane, is, by reason of old age, disease, weakness of mind, or from any other cause unable, unassisted. to properly manage and take care of himself or his property, and by reason thereof would be likely to be deceived or imposed upon by artful or designing persons.' Shelby et al. v. Farve et al., 33 Okla. .651, 126 P. 764; Fish v. Deaver, 71 Okla. 177, 176 P. 251.

"Now Nitey did not belong to the first class. She was not an insane person; she was not adjudicated to be a person of unsound mind. 'From an examination of the petition and order appointing a guardian, we find that the only basis for the appointment was Nitey's inability to manage and look after her estate. She was not even found to be 'mentally' incompetent. Section 4983, C. O. S. 1921 (section 9404 O. S. 1931), therefore. had no application to her case."

The above statements are just as true of the present case as they were of the Nitey Case. It is true that in that case, the county court's order contained merely the finding "that the said Nitey is an incompetent person not being capable to look after said estate", while in the present case, the county court's order refusing to restore the testator's competency uses the words "unsound mind", yet this description is qualified by words which clearly show that said expression referred only to his incompetency. There is no question but what the proceedings had in 1934 with reference to the testator's competency were for the purpose of determining whether or not he came within the second class of persons mentioned in section 1445, O. S. 1931, rather than to determine his sanity. No claim that the testator was insane appears ever to have been made and there is no evidence in the record to support such a claim.

It is an undisputed fact that the testator had been somewhat feeble and in poor health for several years prior to his death, and it must be admitted that in many instances there is a direct relation between physical ailments and mental incapacity, yet there is no conclusive evidence in the present case that the testator's physical condition was sufficient to destroy his testamentary capacity. There was testimony given by and on behalf of the contestants to the effect that during the last years of the testator's life his memory began to fail him and that during some of his illness his mind seemed to be temporarily affected. Such evidence, however. is not conclusive of testamentary capacity. As was held in McClure v. Kerchner, 107 Okla. 28, 229 P. 589:

"The testator must have sufficient memory to comprehend the conditions of his property and his relations to the objects of his bounty, but the fact that the memory of an old person has failed somewhat does not of itself invalidate his will, as occasional lapses of memory, mere decay. or feebleness of memory or absent-mindedness ought not to invalidate a will, unless amounting under our general rule to a mental incapacity to collect the particulars essential to a just testamentary disposition."

Absolute soundness of mind and memory in every respect is not essential to testamentary capacity. Applehans v. Jurgenson, 336 Ill. 427, 168 N. E. 327, 67 A. L. R. 851. Thus when we see what is meant by the "unsoundness" of mind that will constitute testamentary incapacity we find that the evidence of the contestants on that subject is not even directly contradictory to the testimony of those who observed the testator at the time he executed the will. All three of the subscribing witnesses, one of whom was a physician who had known the testator for years, testified positively and unequivocally that at the time he executed the will, the testator was of a sound and disposing mind and memory. We cannot say that such direct evidence of testamentary capacity was outweighed by the circumstances from which contrary inferences might be drawn.

In their argument on the question of undue influence in the present case, counsel for the contestants quote the following language of this court in McCarty v. Weatherly, 85 Okla. 123, 204 P. 632:

"To establish undue influence it is not necessary that there be direct testimony that threats were made or even persistent entreaty or persuasion was brought to bear upon the mind of the testatrix. It is sufficient that, if from all the surrounding circumstances connected with the making of the will it appears that any undue influence has been exercised, the court should not admit the will to probate. In determining the question of undue influence. the court should take into consideration the association of the parties the opportunity for undue influence afforded the person who is especially favored by the terms of the will, and the effect of the will upon those persons whom we would naturally expect to be the recipients of her bounty. But opportunity for undue influence, standing alone, is not sufficient to establish undue influence."

Concerning the point now being discussed, it was held in McClure v. Kerchner, supra:

" 'Undue influence', such as will invalidate a will, must be something which de-

stroys the free agency of the testator at the time when the instrument is made, and which, in effect, substitutes the will of another for that of the testator. It is not sufficient that the testator was influenced by the beneficiaries in the ordinary affairs of life, or that he was surrounded by them and in confidential relations with them at the time of its execution. Mere general influence, not brought to bear on the testamentary act, is not undue influence; but, in order to constitute undue influence, it must be used directly to procure the will, and must amount to coercion destroying the free agency of the testator. Mere suspicion that undue influence was brought to bear is not sufficient to justify the setting aside of the will. Kindt v. Parmenter, 83 Okla. 116, 200 P. 706."

It may be true that the proponent, living in close association with the testator. exercised considerable influence upon him concerning the general affairs of life. The exercise of such influence, however, does not constitute undue influence. See in re Mauvais' Estate (Cal. App.) 185 P. 987; Estate of Morcel, 162 Cal. 188, 121 P. 733. The contestants place reliance upon certain statements (hereinbefore quoted) said to have been made by the testator to the witnesses, Mr. Huffman and Mrs. Powell. These remarks accredited to the testator, among other things, would create the impression that the proponent had importuned the testator to give him the major portion of his property. If such were the true situation, it would still fall short of proof of undue influence. In the case of In re Anderson's Estate, 185 Cal. 700, 198 P. 407, it was said:

"The mere fact that one person has been influenced by the arguments or entreaties of another is not enough to make the influence an undue one. It is not undue unless the pressure has reached a point where the mind of the person subjected to it gives way before it so that the action of such person, taken in response to the pressure, does not in fact represent his conviction or desire, brought about perhaps by argument and entreaty, but represents in truth but the conviction or desire of another. As was said in Estate of Donovan, 140 Cal. 390, 394, 73 P. 1081, quoting from Chaplin: 'The true test of undue influence is that it overcome the will without convincing the judgment.'"

As to influence and persuasion. see. also, Rutherford et ux. v. Morr's. 77 Ill. 397. Nor does evidence that the testator previous to the execution of the will propounded, had indicated a disposition to devise his property in a manner inconsistent with the provisions of said will establish undue influence. In the decision of In re Mauvais' Estate, supra, it was held:

"Statements of a decedent, both prior to and subsequent to the date of a will, that she intended treating all of her children alike in the final disposition of her property, are not of themselves sufficient to establish undue influence on the part of the favored child."

Such evidence is conclusive proof of no more than a change of mind. See Hayes v. West, 37 Ind. 21. See, generally, In re Storer's Will, 28 Minn. 9, 8 N. W. 827; In re Williams' Will, 46 N. Y. S. 791, and other cases cited in the annotation at 79 A. L. R. 1447.

Another impression which might be gained from the testimony of Mr. Huffman and Mrs. Powell is that the proponent had unduly influenced and menaced the testator by threatening to make him change his boarding place, unless he (the testator) acceded to his (the proponent's) wishes in the matter of the testamentary disposition of his property. Such testimony is incompetent to show that the testator was thus influenced. The general rule established by the overwhelming weight of authority is that declarations of the testator not made contemporaneously with the execution of the will, or so near thereto as to constitute a part of the res gestae, are not competent as direct or substantive evidence of the truth of the matters therein stated, when offered on the issue of undue influence inducing the execution of the will. 79 A. L. R. 1447. In order to justify breaking a will on the ground of undue influence the latter must be proved by evidence other than such declarations. See In re Calkins' Estate, 112 Cal. 296, 44 P. 577; Woodville v. Morrell, 130 Minn. 92, 153 N. W. 131; Kirkpatrick v. Jenkins, 96 Tenn. 85, 33 S. W. 819; In re Hess' Will, 48 Minn. 504, 31 Am. St. Rep. 665, 51 N. W. 614: Davidson v. Davidson, 2 Neb. (Unof.) 90, 96 N. W. 409; In re Kah's Estate, 136 Iowa. 116, 113 N. W. 563; Cawthorn v. Haynes, 24 Mo. 236. We find no evidence of anything in the present record which in itself would constitute undue influence. Other than the evidence already dealt with the sole circumstance relied on by the contestants as supporting their contention that undue influence was exercised by the proponent is the fact that he accompanied the testator when he went to the law offices of the Messrs. Adams where the will was drawn and executed. As the evidence shows that the testator had some difficulty in getting about alone, because of his physical condition and failing eyesight, and it also shows that he lived

near the proponent, there is nothing unusual about this circumstance and certainly nothing in the act of accompaniment in itself that would constitute undue influence. Mr. John Adams, the lawyer who supervised the execution of the will and one of the subscribing witnesses, testified that the proponent was present with his father, the testator, during a part of the time that the drawing and execution of the will was being arranged for in the law office, and the essence of his testimony on the question of undue influence is that the proponent took no part, either by word or deed, in these operations. This testimony is not only undisputed, but is corroborated by all of the other subscribing witnesses, who testified that the testator was not acting under undue influence. There is not an iota of evidence in the record to prove that the will was not executed in all respects according to law.

All of the evidence indicated that the testator was a man of very strong will, and he was characterized by some witnesses as even being stubborn. At any rate, the testimony of all witnesses who expressed an opinion about the matter was to the effect that the testator was not the kind of a man who could be easily influenced. There is some indication in the evidence that the testator was impelled to practically disinherit the contestants, Birt Shipman and Macey May Glock, by his feeling of dissatisfaction and animosity toward them because of the part they had had in keeping him under guardianship. What may have been the testator's motives for having his will drawn as he did is not a proper subject for our inquiry, however, in the absence of an affirmative showing of undue influence or testamentary incapacity. The competent evidence of undue influence in the present case is purely circumstantial, and in our opinion any view taken of these circumstances could create no more than a mere suspicion that the testator may have been influenced by the proponent in the testamentary disposition of his property. There is not sufficient evidence to establish "undue influence" as defined by the courts in probate cases. There is nothing in the record to support a conclusion that the will upheld by the trial court was not the product of the testator's own volition. The district court found and adjudged that the testator had the "testamentary capacity to make a good and valid will," and that "he was not at the time he executed said will acting under undue influence, menace, fraud or duress."

In our opinion, this judgment is not against the clear weight of the evidence and therefore cannot be disturbed. It is the order of this court that the judgment of the district court of Logan county in the within cause be, and the same is hereby, affirmed.

OSBORN, C. J., and CORN, GIBSON, and HURST, JJ., concur.